972 F.2d 1527
 35 ERC 1841, 61 USLW 2121, 22 Envtl.
L. Rep. 21,486
 Ira P. DAIGLE and Mary L. Daigle; John Beaver and Mary
Winter; Donald E. Bonner and Julie A. Bonner, and as
parents, natural guardians and next friends of Jamie Bonner
and Julie A. Bonner as parent, legal guardian and next
friend of Stephanie Palaoro; Jay Brown and Mary Jane
Brown; Johnny Ray Brown; Emma C. Anderes; Carl J.
Buschman and Jeanette Buschman, and as parents, natural
guardians and next friends of Catherine L. Buschman; Trudy
J. Clark; Wayne Crum; Diana Crum; Don S. Daigle and Julie
L. Daigle, and as parents, natural guardians and next
friends of Justin S. Daigle, Travis S. Daigle and Elizabeth
M. Daigle; Douglas D. Daigle and Felecia M. Daigle, and as
parents, natural guardians and next friends of Shane R.
Daigle, Amanda M. Daigle and Melissa D. Daigle; John Dowd;
Violet St. Dennis; Alvin Dowd; Mary E. Fuller; Mary
Holmes; Dorothy Waller; Jeffery A. Hudson and Brita A.
Hudson, and as parents, natural guardians and next friends
of Christina D. Hudson; Stephanie Izzo; Thomas Izzo;
Michael Jennings and Mindy Jennings, and as parents, natural
guardians and next friends of Hanna Adel Jennings, Jessica
Ann Jennings and Michael Jedidiah Jennings; Gordon Allen
MacDonald; Robert Joseph MacDonald; Herbert L. Maes;
Edward J. Mikec; Pearl C. Myers; Gary Phillips and Leeanne
Phillips, and as parents, natural guardians and next friends
of Karen Phillips and Lea Ann Phillips as parent, legal
guardian and next friend of Donald Taylor; Elmae M. Rice;
Erwin W. Rice and Karlene K. Rice and as parents, natural
guardians and next friends of Arlo Rice; Paula Rice; Roger
Rice; Porter Richardson; Carolyn M. Roberts; James B.
Roberts; Alma Roberts; Ernest G. Trujillo and Charlotte
Ann Trujillo, and as parents, natural guardians and next
friends of Jessica J. Trujillo and Emily M. Trujillo; James
E. Walters; Helen L. Walters; Rudy L. Martinez, and as
parent, natural guardian and next friend of Edward Paul
Martinez; Julian Montoya and Gloria Montoya, and as
parents, natural guardians and next friends of Jesse
Montoya; Louise Dean; Fred Scoggins and Patricia Scoggins,
Plaintiffs-Appellees, Cross-Appellants,
v.
SHELL OIL COMPANY, Defendant-Appellant, Cross-Appellee,
and
United States of America, Defendant-Appellant, Cross-Appellee.
ROCKWELL INTERNATIONAL CORPORATION, Amicus Curiae.
 Nos. 91-1093, 91-1099 and 91-1143 to 91-1145.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 18, 1992.
 
 Anthony Roisman of Cohen, Milstein, Hausfeld & Toll, Washington, D.C. (Ann C. Yahner, Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, Kathleen Mullen, John R. Holland, Denver, Colo., Howard Sedran, Levin, Fishbein, Sedran & Berman, Philadelphia, Pa., with him, on the brief), for Daigle, et al.
 Linnea Brown, Holme Roberts & Owen, Denver, Colo. (Edward J. McGrath and Robert Tuchman, Holme Roberts & Owen, with her, on the brief), for Shell Oil Co.
 Edward J. Shawaker, Atty., Environmental and Natural Resources Div., and Steven M. Talson, Atty., Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C. (Richard B. Stewart and Stuart M. Gerson, Asst. Attys. Gen., Barry M. Hartman, Acting Asst. Atty. Gen., J. Patrick Glynn, Director, and J. Charles Kruse, Sp. Litigation Counsel, Torts Branch, Civ. Div., Anne S. Almy, Bradley S. Bridgewater and David A. Carson, Attys., Environmental and Natural Resources Division, Dept. of Justice, Washington, D.C., with them, on the brief), for U.S.
 Joseph J. Bronesky, Sherman & Howard, Denver, Colo., John D. Aldock, Franklin D. Kramer, Micahel S. Giannotto, Joseph F. Yenouskas, Shea & Gardner, Washington, D.C., for amicus curiae Rockwell Intern. Corp. in support of Shell Oil Co.
 Before LOGAN, MOORE and BALDOCK, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 
 1
 This toxic tort case arises from the cleanup effort at the Rocky Mountain Arsenal (the Arsenal), a federally controlled Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) site near Commerce City, Colorado. 42 U.S.C.A. § 9601 et seq. The Plaintiffs-appellees, a group of individuals who reside near the Arsenal, seek "response costs" from Defendants-appellants Shell Oil Company (Shell) and the Government for medical monitoring under CERCLA § 107(a), 42 U.S.C.A. § 9607(a), and damages from Shell under six diversity claims including an "ultrahazardous activity" strict liability claim. These latter tort claims also were brought against the Government pursuant to the Federal Tort Claims Act (FTCA). 28 U.S.C.A. §§ 1346(a) and 2671-2680. Plaintiffs contend that they suffered personal injury and property damage as a result of airborne pollutants released during the joint cleanup effort at the Arsenal by Shell and the Government.
 
 
 2
 Shell filed a Rule 12(b)(6) motion to dismiss the CERCLA claim and the ultrahazardous activity claim. The Government filed a separate Rule 12(b)(6) motion to dismiss the CERCLA claim as well as a Rule 12(b)(1) motion to dismiss all the tort claims for lack of subject matter jurisdiction under the FTCA. With some uncertainty because of the factual immaturity of the case and the complete lack of appellate guidance, the district court denied the motions to dismiss the CERCLA medical monitoring claims. The court also denied Shell's motion to dismiss the ultrahazardous activity claim. But the court granted the Government's Rule 12(b)(1) motion to dismiss the FTCA claims, holding that it lacked subject matter jurisdiction because the Government's cleanup activities fell under the discretionary function exception to the FTCA waiver of sovereign immunity. See 28 U.S.C.A. § 2680(a).
 
 
 3
 Shell and the Government appeal, contending that "response costs" under CERCLA § 107(a) do not encompass medical monitoring costs. Shell also appeals the denial of its motion to dismiss the ultrahazardous activity claim, contending that Colorado courts would not classify the generation, treatment, storage and disposal of hazardous waste as an ultrahazardous activity giving rise to a strict liability claim. Plaintiffs cross-appeal the 12(b)(1) dismissal, contending that the Government's actions were not within the discretionary function exception. All issues have been certified under Fed.R.Civ.P. 54(b) for interlocutory review, and we exercise jurisdiction pursuant to 28 U.S.C.A. §§ 1291 and 1292(b).
 
 
 4
 We reverse the rulings denying dismissal of the CERCLA § 107(a) "response cost" claims against Shell and the Government. We affirm the order dismissing all of the FTCA claims against the Government, and we affirm the order denying dismissal of the ultrahazardous activity strict liability claim against Shell. The case is remanded to the district court for proceedings consistent with this opinion.
 
 I. Background
 
 5
 This controversy stems from the year 1956, when the Army constructed and began using Basin F, a ninety-three acre hazardous waste surface impoundment on the Arsenal. The Army, as operator of the Arsenal, used Basin F to impound hazardous waste generated from its chemical warfare agent, chemical product and incendiary munition manufacturing activities. In addition, Shell used Basin F under lease from the Army to impound hazardous waste generated in its herbicide and pesticide manufacturing activities on the Arsenal. The combined activities of the Army and Shell on the Arsenal resulted in one of the worst hazardous waste pollution sites in the country, and Basin F is only a small portion of the problem.[1] Army officials have estimated that the twenty-seven square mile Arsenal has 120 contamination sites which contain huge quantities of liquid and solid wastes, some of which is unique because of the mixture of private herbicide and pesticide manufacturing activities with Army munitions manufacturing activities. See applt. app. at 342-43 (declaration of Donald L. Campbell, Deputy Program Manager, Army Program Manager's Office). Earnest response to these problems began in 1984, when the Army, with guidance from EPA, began a Remedial Investigation and Feasibility Study (RI/FS) pursuant to CERCLA § 104, 42 U.S.C.A. § 9604.[2] The purpose of this study was to identify contamination sites and determine the feasibility of proposed responses. As part of this extremely long and complex process, the Army identified fourteen specific sites which needed Interim Response Actions (IRA's) to stop the spread of contaminants so as to protect human health and the environment. As indicated by their classification, these actions were to take place in the interim, before the implementation of a permanent, remedial response. Basin F was among the fourteen priority sites.
 
 
 6
 Hazardous wastes apparently had leaked from Basin F into the surrounding environment for many years before the IRA finally began in April 1988. The IRA was taken as a joint effort by the Army and Shell in agreement with EPA and the State of Colorado. In accordance with the agreed upon plan, the government contracted Ebasco Constructors, Inc., a private contractor, to transfer the liquid hazardous waste from Basin F to on-site storage tanks and lined surface impoundments, move contaminated solids into a lined and capped waste pile, and place a clay cap, top soil and vegetation over soils remaining within the Basin. The bulk of this year-long process ended in March 1989 with the capping of the solid waste pile.
 
 
 7
 The parties involved in the Arsenal cleanup have litigated extensively in an effort to assign responsibility under CERCLA and various state statutes for the cleanup. This case, however, centers not on the necessary costs of the IRA but on alleged injuries resulting from the cleanup effort itself. The containment effort stirred up noxious odors and airborne pollutants that blew over Plaintiffs' residences, most of which were located in a trailer park one-and-a-half miles due west of Basin F. Some Plaintiffs registered complaints at least by December 1988, but the government decided that the odors were "a source of intermittent discomfort which [was] outweighed by the long-term benefit to the community of the removal activity conducted at Basin F." Applt. app. at 351, p 24.[3] Plaintiffs allege that this "intermittent discomfort" brought on property and economic damages and a variety of ailments ranging from conjunctivitis to skin rashes as well as the possibility of latent disease. We address the CERCLA medical monitoring issue first in order to facilitate review. Discussions of the FTCA and the ultrahazardous activity issues then follow.
 
 II. Medical Monitoring
 
 8
 Plaintiffs seek the establishment of a fund to finance longterm "medical monitoring" or "medical surveillance" designed to detect the onset of any latent disease that may have been caused by exposure to toxic fumes stirred up during the Basin F cleanup. In their amended complaint, Plaintiffs state that the fund and the monitoring are necessary "to assist plaintiffs and class members in the prevention or early detection and treatment of chronic disease." First Amended Complaint, Count VII, p 178. This type of action has been increasingly recognized by state courts as necessary given the latent nature of many diseases caused by exposure to hazardous materials and the traditional common law tort doctrine requirement that an injury be manifest. In re Paoli RR. Yard PCB Litigation, 916 F.2d 829, 849 (3d Cir.1990) (citing cases), cert. denied, --- U.S. ----, 111 S.Ct. 1584, 113 L.Ed.2d 649 (1991). State tort law, however, is not at issue here. Plaintiffs instead seek redress in CERCLA § 107(a) private right of recovery for "response costs." Whether § 107(a) response costs include medical monitoring is an issue of first impression in the courts of appeals, although several district courts have decided the issue. See infra pp. 1534-35. In reviewing the denial of Defendants' Rule 12(b)(6) motions on this point we apply the same standard as the district court. We therefore accept all well-pleaded facts as true and draw all reasonable inferences in favor of the nonmovant Plaintiffs. Zilkha Energy Co. v. Leighton, 920 F.2d 1520, 1523 (10th Cir.1990). Dismissal for failure to state a claim is appropriate only if the Plaintiffs can prove no set of facts that would entitle them to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).
 
 
 9
 We turn first to the purpose and structure of CERCLA, 42 U.S.C. §§ 9601, et seq., as amended by the 1986 Superfund Amendments and Reauthorization Act (SARA), Pub.L. No. 99-499, 100 Stat. 1613 (1986). Congress enacted CERCLA to facilitate the expeditious cleanup of environmental contamination caused by hazardous waste releases. See Colorado v. Idarado Mining Co., 916 F.2d 1486, 1488 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991). In furtherance of this purpose, the Act establishes several mechanisms to respond to releases or threatened releases and delineates the respective powers and rights of governmental entities and private parties. Id. At issue here is § 107(a), which is designed to further the overall objective of shifting liability for cleanup costs to responsible parties. Id. The statute provides that certain responsible parties may be sued for
 
 
 10
 (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
 
 
 11
 (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;
 
 
 12
 (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
 
 
 13
 (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.
 
 
 14
 42 U.S.C.A. § 9607(a)(4) (emphasis supplied). It is undisputed that Defendants are responsible parties as "owner-operators" of Basin F, the "facility." At issue is whether Plaintiffs' monitoring claim falls within the subsection (B) private right of recovery for "any other necessary costs of response...."[4]
 
 
 15
 In keeping with its notorious lack of clarity, CERCLA leads us down a convoluted path to the definition of "any other necessary costs of response." Actually, the drafters did not directly define the phrase as a whole, opting instead to define only the term "response." CERCLA § 101(25), 42 U.S.C.A. § 9601(25). A "response" is a "removal action" or a "remedial action." Id. "Removal actions," in turn, are actions designed to effect an interim solution to a contamination problem:
 
 
 16
 "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].
 
 
 17
 42 U.S.C.A. § 9601(23) (emphasis supplied). "Remedial actions," on the other hand, are designed to effect a permanent solution to the contamination problem:
 
 
 18
 "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment....
 
 
 19
 42 U.S.C.A. § 9601(24) (emphasis supplied).[5]
 
 
 20
 In arguing for affirmance of the district court's denial of Defendants' 12(b)(6) motions, Plaintiffs direct our attention to the emphasized language, which in both definitions refers to "monitoring" in the "public health and welfare" context. They argue that this plain language clearly covers the monitoring costs they seek, citing Brewer v. Ravan, 680 F.Supp. 1176 (M.D.Tenn.1988), and several cases which cursorily arrived at the same result as Brewer. See Williams v. Allied Automotive, 704 F.Supp. 782, 784-85 (N.D.Ohio 1988); Adams v. Republic Steel Corp., 621 F.Supp. 370, 376-77 (W.D.Tenn.1985); Jones v. Inmont, 584 F.Supp. 1425, 1429-30 (S.D.Ohio 1984). Applying what it considered the plain language of the definitions, the Brewer court held that § 9601 "removal" and "remedial" costs encompass medical monitoring as long as the monitoring is "conducted to assess the effect of the release or discharge on public health or to identify potential public health problems presented by the release." Id. at 1179. This holding apparently was persuasive to the district court in this case, although it did not write a memorandum in support of its ruling.
 
 
 21
 Plaintiffs correctly assert that certain monitoring costs are recoverable as "removal action" or "remedial action" "response costs." The express statutory language admits of no other result; however, we think Plaintiffs and the Brewer court go awry in affording a broad sweep to the "public health and welfare" language in the definitions. Several district courts, led by the comprehensive analysis in Coburn v. Sun Chemical Corp., 28 Env't Rep.Cas. (BNA) 1665, 1988 WL 120739 (E.D.Pa. Nov. 9, 1988), have expressly rejected Brewer as too broad, basing their conclusion on an examination of the plain language of the definitions in context with the overall structure and history of CERCLA. See Woodman v. United States, 764 F.Supp. 1467, 1469-70 (M.D.Fla.1991); Bolin v. Cessna Aircraft Co., 759 F.Supp. 692, 713-14 (D.Kan.1991); Cook v. Rockwell International Corp., 755 F.Supp. 1468, 1473-74 (D.Colo.1991); Ambrogi v. Gould, Inc., 750 F.Supp. 1233, 1246-50 (M.D.Pa.1990); Werlein v. United States, 746 F.Supp. 887, 901-905 (D.Minn.1990). Defendants base their argument for reversal on the reasoning of these courts.
 
 
 22
 Turning to the context of the "monitoring" and "health and welfare" language, we note that both definitions are directed at containing and cleaning up hazardous substance releases. For example, the "monitor[ing]" allowed for under the "removal action" definition relates under the plain statutory language only to an evaluation of the extent of a "release or threat of release of hazardous substances." 42 U.S.C.A. § 9601(23). And the "remedial action" definition expressly focuses only on actions necessary to "prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." Id. § 9601(24).
 
 
 23
 Plaintiffs, however, concentrate on the additional § 9601(23) phrase referring to "other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare...." They contend that this should be read broadly to cover any type of monitoring that would mitigate health problems. Medical monitoring would mitigate the potential individual health problems of Plaintiffs, but the general provision for prevention or mitigation of "damage to public health or welfare" must be interpreted consistently with the specific examples of "removal costs" enumerated in the definition. See Ambrogi, 750 F.Supp. at 1247. The specific examples all prevent or mitigate damage to public health by preventing contact between the spreading contaminants and the public. See, for example, the suggested actions regarding fencing, alternate water supplies, and temporary housing. Supra p. 1534. Although the statute provides that "removal" costs are not limited to these specific examples, we think it only reasonable under traditional statutory canons of construction to conclude that any other recoverable costs must at least be of a similar type. See Ambrogi, 750 F.Supp. at 1247 and n. 17 (discussing ejusdem generis). Longterm health monitoring of the sort requested by Plaintiffs--"to assist plaintiffs and class members in the prevention or early detection and treatment of chronic disease," see First Amended Complaint, Count VII, p 178--clearly has nothing to do with preventing contact between a "release or threatened release" and the public. The release has already occurred.
 
 
 24
 Our limited construction of the definition of "response costs" is supported by reference to legislative history, "sparse" as it is. See Exxon v. Hunt, 475 U.S. 355, 373, 106 S.Ct. 1103, 1114, 89 L.Ed.2d 364 (1986). Plaintiffs' request for medical monitoring to allow "prevention or early detection and treatment of chronic disease" smacks of a cause of action for damages resulting from personal injury. And the history of the enactment of CERCLA reveals that both houses of Congress considered and rejected any provision for recovery of private damages unrelated to the cleanup effort, including medical expenses. Each chamber of Congress considered Bills which contained provisions for causes of action for certain economic damages and for personal injury. For example, the original House Bill contained a provision for private recovery of "all damages for personal injury, injury to real or personal property, and economic loss, resulting from such release or threatened release." H.R. 7020, 96th Cong., 2d Sess., as submitted by Representative Florio on April 1, 1980, reprinted in Superfund: A Legislative History, Environmental Law Institute (1982), Vol. III, 183. This provision did not make it out of committee, and the final Bill as enacted by the House included no provision for medical expense recovery. H.R. 7020, 96th Cong., 2d Sess., as enacted Sep. 30, 1980, reprinted in Superfund: A Legislative History, Vol. III, 89. The Senate Bill also contained a provision for private recovery of "all out-of-pocket medical expenses, including rehabilitation costs or burial expenses, due to personal injury." S. 1480, 96th Cong., 2d Sess. (1980), reprinted in Superfund: A Legislative History, Vol. I, 289. But this provision was later deleted by amendment, and H.R. 7020 was ultimately substituted as a compromise bill, amended, enacted by both chambers and signed into law without any reference to medical expenses.[6]
 
 
 25
 District courts examining this evolution have looked to statements of Senator Randolph, the cosponsor of the compromise bill, for explanation. See Coburn, 1988 WL 120739 at * 2. See also Cook, 755 F.Supp. at 1474 (citing Coburn and quoting Senator Randolph); Werlein, 746 F.Supp. at 903 (same). Senator Randolph expressly acknowledged the intentional deletion of any private cause of action for personal injury; the Senator stated that "[w]e have deleted the Federal cause of action for medical expenses or income loss." 126 Cong.Rec. S 14964 (daily ed. Nov. 24, 1980), reprinted in Superfund: A Legislative History, Vol. II, 260. Given Senator Randolph's status as a cosponsor of the compromise bill, we find his statements a reliable indicator of Congressional intent to exclude "medical expenses" from recovery. See North Haven Board of Education v. Bell, 456 U.S. 512, 526-27, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982) (noting "authoritative" status of the remarks of the sponsor of a bill). His remarks, as well as statements from other Senators and Representatives throughout the evolution of CERCLA,[7] confirm the obvious implication that Congress intentionally deleted all personal rights to recovery of medical expenses from CERCLA.
 
 
 26
 All of this is not to say that CERCLA ignores public health. Section 104(i) establishes the Agency for Toxic Substances and Disease Registry (ATSDR) and the 1986 SARA Amendments empower ATSDR with an elaborate scheme of functions relating to the assessment of health effects of actual and threatened hazardous substance releases. See generally Susan M. Cooke, The Law of Hazardous Waste, Management, Cleanup, Liability and Litigation, § 13.01[d][vii] (MB) (1992) (overview of ATSDR health assessment functions under § 104(i) as amended by SARA). For example, ATSDR is required to conduct formal health assessments for every NPL facility, supra note 1. CERCLA § 104(i)(6)(A); 42 U.S.C.A. § 9604(i)(6)(A). Additionally it is authorized to conduct formal health assessments on other sites if provided with information from individuals or physicians regarding human contact with released hazardous materials. CERCLA § 104(i)(6)(B); 42 U.S.C.A. § 9604(i)(6)(B). Such physicians and individuals may petition the ATSDR to perform a health assessment, and the ATSDR is required to provide a written explanation of why an assessment is not appropriate in case of a denial. Id. If a health assessment is performed, the ATSDR considers a variety of factors which indicate the risk to human health. CERCLA § 104(i)(6)(F); 42 U.S.C.A. § 9604(i)(6)(F). Depending on the results of the health assessment, the ATSDR is empowered, among other things, to conduct pilot epidemiologic studies, CERCLA § 104(i)(7); 42 U.S.C.A. § 9604(i)(7), establish a registry of exposed persons, CERCLA § 104(i)(8); 42 U.S.C.A. § 9604(i)(8), and, in the case of a serious health risk, establish a long-term "health surveillance program" to include "periodic medical testing" and a treatment referral mechanism for persons who are screened positive, CERCLA § 104(i)(8); 42 U.S.C.A. § 9604(i)(8).
 
 
 27
 Plaintiffs direct our attention to the medical monitoring ("health surveillance") provisions under § 104(i), arguing that these provisions indicate that the types of medical expenses intentionally excluded from CERCLA response costs did not include medical surveillance. The deleted provisions, however, dealt with a personal right of recovery for medical expenses, not the comprehensive ATSDR health assessment procedures enacted under the 1986 SARA Amendments. Furthermore, the liability and funding for ATSDR costs are separate from response costs. Section 107(a), the liability provision with which we started our analysis above, provides a government cause of action to recover § 104(i) ATSDR health assessment costs separately from the cause of action for response costs. See supra p. 1533, compare § 107(a)(4)(D) (health assessment costs) with subsection (4)(A) (response costs). And § 111 provides for Superfund reimbursement for § 104(i) ATSDR health assessment costs separately from reimbursement for response costs. Compare § 111(a)(1); 42 U.S.C.A. § 9611(a)(1) (funding authorization for general response costs) with § 111(c)(4) and (m); 42 U.S.C.A. § 111(c)(4) and (m) (funding authorization for ATSDR costs). That Congress provided separate recovery and funding provisions for health assessment costs indicates that such costs, including the medical monitoring Plaintiffs seek, differ from response costs, and "response costs" are the only available costs to private parties under the § 107(a)(4)(D) liability provision.
 
 
 28
 Given the language of the response costs definitions and the history and structure of CERCLA, we hold that the medical monitoring which Plaintiffs seek is not recoverable under CERCLA § 107(a). We therefore reverse the district court's order denying Shell's and the Government's motion to dismiss.
 
 III. Discretionary Function Exception
 
 29
 At issue next is the district court's Rule 12(b)(1) dismissal of Plaintiffs' Federal Tort Claims Act (FTCA) claims against the United States. See 28 U.S.C.A. §§ 1346(b), 2671-89. The FTCA waives the sovereign immunity of the Government with respect to certain claims for personal injuries caused by government employees. Id. §§ 1346(b). Accordingly, the Government can be held liable "in the same manner and to the same extent as a private individual under like circumstances." Id. § 2674. However, the FTCA excepts from this waiver claims that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Id. § 2680(a). Section 2680(a), commonly referred to as the "discretionary function exception," "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). Its application therefore presents a threshold jurisdictional determination which we review de novo. See Johnson v. United States, 949 F.2d 332, 335-36 (10th Cir.1991); Weiss v. United States, 889 F.2d 937, 938 (10th Cir.1989).
 
 
 30
 The Supreme Court has developed a substantial amount of law regarding the discretionary function exception. See, e.g., United States v. Gaubert, --- U.S. ----, ----, 111 S.Ct. 1267, 1269, 113 L.Ed.2d 335 (1991); Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); Varig Airlines, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660; Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The determination of whether the discretionary function applies to a particular act, however, boils down to a two-pronged analysis of the nature of the act. See Berkovitz, 486 U.S. at 536-37, 108 S.Ct. at 1959. First, the act must "involve an element of judgment or choice" if the exception is to apply. Id. at 536, 108 S.Ct. at 1958. Under this first prong, we must determine whether a specific and mandatory regulation, statute or policy requires a particular course of action. Id. If a specific and mandatory statute, regulation or policy is applicable, "there is no discretion ... for the discretionary function exception to protect" and the Government's action in connection therewith will be subject to an FTCA claim. Berkovitz, 486 U.S. at 536, 108 S.Ct. at 1959. If, on the other hand, the Government's conduct is not controlled by specific directives, we must proceed to the second prong of the analysis and determine whether the discretion involved "is of the kind that the discretionary function was designed to shield." Id. at 537. Ordinary discretion, such as that exercised by a government agent in driving his automobile "on a mission connected with his official duties," is not the kind of discretion that the exception was designed to shield. Gaubert, --- U.S. at ----, 111 S.Ct. at 1275 n. 7. Rather, the exception was designed to shield only discretion that is "based on considerations of public policy." Berkovitz, 486 U.S. at 537, 108 S.Ct. at 1959. Only decisions that are "susceptible to policy analysis" are protected by the discretionary function exception. Gaubert, --- U.S. at ----, 111 S.Ct. at 1275. This interpretation effectuates Congress' desire to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Varig Airlines, 467 U.S. at 814, 104 S.Ct. at 2765.
 
 
 31
 Discretionary function cases in this Circuit generally have fallen into one of two broad categories: (1) challenges to the alleged negligent design or construction of a government program; or (2) challenges to the alleged negligent failure to warn of a hazardous condition. Johnson, 949 F.2d at 336 n. 4 (citing cases). This case involves both categories, as Plaintiffs challenge both the execution of the Basin F cleanup and the failure of Army officials adequately to warn of impending toxic air emissions.[8] We examine each category in turn, keeping in mind that the we are not here concerned with any negligence which the Army may have committed in cleaning up Basin F. The discretionary function issue presents a "threshold ... jurisdictional issue which precedes any negligence analysis." Id. at 335. "When the government performs a discretionary function, the exception to the FTCA applies 'whether or not the discretion involved be abused.' " Redmon v. United States, 934 F.2d 1151, 1157 (10th Cir.1991) (quoting 28 U.S.C. § 2680(a)). Our sole inquiry, therefore, is to determine whether Plaintiffs have overcome the discretionary function exception by pleading facts sufficient to demonstrate a clear waiver of sovereign immunity. See Gaubert, --- U.S. at ----, 111 S.Ct. at 1274.
 
 
 32
 A. Execution of the Basin F IRA.
 
 
 33
 Applying the discretionary function analysis to the Army's activities at Basin F, Plaintiffs contend that the Army violated several specific and mandatory statutory and regulatory provisions, and, in the alternative, that its actions were not policy based and therefore should not be shielded by the discretionary function exception. Plaintiffs' on appeal have thoroughly briefed arguments in an attempt to demonstrate how specific Resource Conservation and Recovery Act (RCRA) provisions, 42 U.S.C.A. §§ 6901 et seq., and various air pollution provisions were applicable to the IRA and how the Army failed to comply.[9] In response, the Government relies primarily on a waiver theory, arguing that we should not address these arguments regarding violations of specific and mandatory directives because Plaintiffs did not raise them in the district court. The Government also disputes Plaintiffs' policy arguments.
 
 
 34
 Our review of the record confirms the Government's assertion. The complaint contains no reference to the violations now alleged, and none was raised specifically and developed in response to the Government's motion to dismiss. Rather than discussing RCRA, to which the bulk of their appellate briefs is dedicated, Plaintiffs argued below that CERCLA required that the Basin F IRA be conducted in a manner which would protect human health and that the Government's discretion was restricted "at every turn" by a "myriad of statutes, regulations, policies, guidelines and standards that were imposed by the federal government and by agreements among the principal actions." Applt. app. at 184 (Plaintiffs' response to Government's motion to dismiss). Plaintiffs attached thick documents to their response in an attempt to provide a paper trail for the court, but they made no specific arguments, leaving it to the court to divine which of the "myriad" regulations were violated and how such violations related to the allegations in the complaint. Faced with a ream of material and a total lack of guidance from Plaintiffs, the district court sought assistance at oral argument, repeatedly asking Plaintiffs' counsel to apply the discretionary function exception analysis by referencing and arguing specific violations so that the record could be further developed. See applt. brief, attachment at 9-13. This counsel failed to do. Not surprisingly, the district court did not proceed through a detailed review of the record in search of Plaintiffs' arguments. Instead, the court granted the motion without opinion or comment as to its rationale, noting only that it considered itself constrained by Tenth Circuit case law.
 
 
 35
 As a general rule we refuse to consider arguments raised for the first time on appeal unless sovereign immunity or jurisdiction is in question. Hicks v. Gates Rubber Co., 928 F.2d 966, 970-71 (10th Cir.1991). Although sovereign immunity and hence subject matter jurisdiction are at issue in this case, our responsibility to ensure even sua sponte that we have subject matter jurisdiction before considering a case differs from our discretion to eschew untimely raised legal theories which may support that jurisdiction. Ceres Gulf v. Cooper, 957 F.2d 1199, 1207 n. 16 (5th Cir.1992). We have no duty under the general waiver rule to consider the latter. Id. As Plaintiffs suggest, however, we may depart from the general waiver rule in our discretion, particularly when we are presented with a strictly legal question the proper resolution of which is beyond doubt or when manifest injustice would otherwise result. See Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); Hicks, 928 F.2d at 970; Cavic v. Pioneer Astro Industries, Inc., 825 F.2d 1421, 1425 (10th Cir.1987). We apply this discretionary exception on a case by case basis. Hicks, 928 F.2d at 970.
 
 
 36
 Plaintiffs stress that our review of the district court's subject matter jurisdiction determination is de novo, and they contend that their legal arguments undoubtedly establish jurisdiction. Given these factors, Plaintiffs argue that it would be manifestly unjust for us not to consider their arguments. Indeed our standard of review is de novo and we owe no deference to the district court, but we nevertheless lack the "facilitation accorded appellate review" we otherwise would have had if the district court had been allowed to consider these arguments and develop the record fully. Hicks, 928 F.2d at 970. Fairness to the district court and the Government, neither of which was made aware of Plaintiffs' arguments, militates against granting an exception. See id. at 970-71 (basic policies which underlie the waiver rule include considerations of fairness to both the district court and the opposing party, avoidance of surprise on appeal necessitating remands for additional findings, and the need for finality of litigation). Moreover, we cannot say that Plaintiffs have undoubtedly demonstrated an unequivocal waiver of sovereign immunity; the Government has argued in the alternative that any of the shortcomings that might have occurred involved Applicable or Relevant and Appropriate Regulations (ARARs), which the Government contends are discretionary under CERCLA because it was required to comply only to the "maximum extent possible." See CERCLA § 121(b)(1); 42 U.S.C.A. § 9621(b)(1). We need not delve into an in depth analysis on this point other than to say that the Plaintiffs new arguments do not go unchallenged. Plaintiffs had ample opportunity to develop their arguments below--with over two years of discovery, a response to the Government's motion to dismiss, and a motion to reconsider--and they simply failed to do so. Under these circumstances we cannot find injustice and therefore we refuse to consider the new arguments.
 
 
 37
 Without the new arguments and the vague reference to the myriad of regulatory provisions, Plaintiffs are left with the only argument on appeal which bears any resemblance to what was argued below--that the Army violated CERCLA's health and safety provisions by "gassing the neighborhood." Congress did have an overriding concern for public health and safety in enacting CERCLA. This is evidenced in the language of CERCLA § 104(a)(1), 42 U.S.C.A. § 9604(a)(1), which provides the general authorization for response actions such as those taken at the Arsenal. Section 104(a)(1) authorizes the President to take any response measure which is "consistent with the national contingency plan [and] which the President deems necessary to protect the public health or welfare or the environment." Furthermore, § 104(a)(1) instructs the President "to give primary attention to those releases which the President deems may present a public health threat." Also, CERCLA § 101(23), 42 U.S.C.A. § 9601(23), is pertinent because the Basin F IRA was the substantial equivalent of a "removal action." That section, as discussed above, see supra II, defines "removal actions" as including measures "necessary to prevent, minimize, or mitigate damage to the public health or welfare...." Plaintiffs also point to CERCLA § 121(d)(1), which requires that any overall remedial action "attain a degree of cleanup of ... at a minimum which assures protection of human health and the environment." 42 U.S.C.A. § 9621(d)(1).[10] In essence, Plaintiffs argue that the Army did not have the discretion under these statutory provisions to release toxic gases into their neighborhood and thereby create an "imminent and substantial endangerment to their health and welfare." Applt. brief at 22.
 
 
 38
 Harsh as it may be, whether the Army substantially endangered Plaintiffs' health and welfare is irrelevant to the discretionary function determination. The question is not whether the Army fell short in its efforts to attain the general health and safety goals of CERCLA, but whether the Army's shortcomings involved violations of specific, mandatory directives. And the health and safety provisions cited by the Plaintiffs are not such specific and mandatory directives. We rejected a similar argument in Allen v. United States, 816 F.2d 1417 (10th Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988), the case relied on but not elaborated on by the district court. The Allen plaintiffs complained of injuries caused by fallout from open-air atomic and nuclear weapons testing. The Atomic Energy Commission (AEC) had carried out the open-air tests pursuant to the Atomic Energy Act of 1946, Pub.L. No. 585, 60 Stat. 755, in which "Congress ... repeatedly evinced the general intent that the tests should be conducted so as not to jeopardize the health and safety of the population downwind." Id. at 1425 (McKay, J., concurring). Critical to the holding, however, was that Congress had left it to the Atomic Energy Commission to determine how to attain this public health and safety goal. Id. at 1421 (citing Varig Airlines, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660, wherein it was left to the Secretary of Transportation and the Federal Aviation Administration to determine how to attain general safety goals). The Allen plaintiffs were unable "to point to a single instance in which [AEC] personnel ignored or failed to implement specific [directives]." Id. Instead, their "entire case rest[ed] on the fact that the government could have made better plans." Id. at 1424. In light of the policies which underlay the plans--public safety and national security--we refused to "second-guess" the AEC and held that the discretionary function exception barred suit. Id. (citing Varig Airlines, 467 U.S. at 814, 104 S.Ct. at 2764). See also Kennewick Irrigation District v. United States, 880 F.2d 1018, 1026 (9th Cir.1989) ("A general statutory duty to promote safety, as was incumbent upon the FAA in Varig, would not be sufficient [to remove discretion].").
 
 
 39
 As in Allen, Plaintiffs' challenge to the execution of the Basin F cleanup is but an assertion that the Army could have done a better job in planning for and attaining the overall goals of public health and safety as expressed throughout CERCLA. For example, in their first amended complaint Plaintiffs allege that "the United States Army and Shell rushed into the clean-up without proper planning concerning the effects of the clean-up activities on site conditions or upon the health and property of those living in surrounding neighborhoods," First Amended Complaint p 95, and that the Army and Shell "were each a principal participant in all technical analyses, decisions and recommendations related to the Clean-up of Basin F," id. p 101. Without evidence of specific violations, these generalized claims cannot survive the discretionary function exception unless the challenged discretion is not policy based.
 
 
 40
 There seems little doubt in this case that the Army's actions at the Arsenal, and at Basin F in particular, involved policy choices of the most basic kind. The Army, Shell, and the EPA were faced with a monumental task in the cleanup and remediation of the hazardous waste contamination at the Arsenal, a task which had run into the $200 million range at the start of this litigation. Nothing in CERCLA or the National Contingency Plan compelled them to prioritize the removal action at Basin F. Instead, through the process of a lengthy RI/FS study involving numerous federal agencies, the state of Colorado, and public comment, they determined that Basin F and the other thirteen IRA sites on the Arsenal presented the greatest risk to the environment and to human health because of continuing environmental contamination. How they were to go about containing the spread of contamination before further damage could occur while still protecting public health touched on policy choices, not the least of which involved the "translation" of CERCLA's general health and safety provisions into "concrete plans." Allen, 816 F.2d at 1427 (McKay, J., concurring). This type of "translation involve[s] the very essence of social, economic, and political decisionmaking--the precise policy choices protected by the discretionary function exception." Id. The administrator must balance overall priorities--in this case the need for a prompt cleanup and the mandate of safety--with the realities of finite resources and funding considerations. Id. (citing Varig Airlines, 467 U.S. at 820, 104 S.Ct. at 2767). See also The Law of Hazardous Waste § 12.03[a] (discussing general principles underlying CERCLA, including prompt cleanup of waste sites, protection of human health and the environment). We are not permitted to "second-guess" that policy determination.
 
 
 41
 It is insufficient under the discretionary function exception for Plaintiffs simply to allege that the Army "rushed into the clean-up without proper planning concerning the effects of the clean-up activities on site conditions or upon the health and property of those living in surrounding neighborhoods." See supra. When government agents are authorized to exercise discretion in carrying out established government policy, such as the policies underlying CERCLA response actions, the exercise of that discretion is presumed to be grounded in policy. See Gaubert, --- U.S. at ----, 111 S.Ct. at 1274. To overcome this presumption, a plaintiff "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." Id. --- U.S. at ----, 111 S.Ct. at 1274-75. Otherwise, the plaintiff will not have met his burden of pleading facts which would establish the court's jurisdiction. In light of our opinion in Allen, we do not think that Plaintiffs' general allegations of deficient planning and execution of the Basin F IRA overcome this presumption. Accordingly, we affirm the district court's dismissal.[11]
 
 B. Failure to Warn
 
 42
 Concentrating on the second prong of the discretionary function analysis, Plaintiffs contend that the Army's alleged failure to give adequate warnings of the Basin F toxic air emissions did not implicate public policy concerns. They rely on Boyd v. United States, 881 F.2d 895 (10th Cir.1989), in which we held that the Army Corps of Engineers' decision to zone a portion of a federally controlled lake nonswimming implicated policy concerns but that its failure to post warning signs of the hazards in that area did not. Id. at 898 (citing Indian Towing, 350 U.S. at 69, 76 S.Ct. at 127, in which the Supreme Court held that the negligent failure to maintain a lighthouse was actionable even though the initial decision was a discretionary policy judgment). See also Smith v. United States, 546 F.2d 872, 875-878 (10th Cir.1976) (failure to warn of thermal pool hazard in national park actionable even though decision to leave area undeveloped was a discretionary policy judgment). We therefore held that the failure to warn claim did not fall under the discretionary function exception. Plaintiffs likewise contend that the exception should not apply in this case.
 
 
 43
 Our cases by no means establish that all failure to warn claims are actionable, however. In Zumwalt v. United States, 928 F.2d 951 (10th Cir.1991), for instance, we distinguished Boyd and Smith, holding that the Park Services' failure to post warning signs on a wilderness trail was related to the overall policy decision of maintaining the trail in a wilderness state whereas there was no such connection between the failure to warn and the decisions which created the hazards in Boyd and Smith. Id. at 955. We held that "[a] decision that is a component of an overall policy decision protected by the discretionary function exception also is protected by this exception." Zumwalt, 928 F.2d at 955. See also Johnson, 949 F.2d at 340 (same).
 
 
 44
 The Plaintiffs are not challenging the simple failure to post warning signs as in Smith and Boyd. Instead, they are contending that the Army did not do an adequate job of planning for and disseminating information regarding the hazards of the Basin F IRA process, a process which we have already determined was infused with policy implications including prompt and cost-effective yet safe cleanup of hazardous wastes. This case is rather like Allen. As mentioned above, the plaintiffs in that case challenged the AEC's failure to give adequate warnings of the dangers involved in open-air atomic testing. We held that the plaintiffs could not simply allege that the AEC could have done a better job of carrying out its statutory objectives of testing atomic weapons while protecting the health and safety for surrounding residents. Likewise, Plaintiffs' challenge to the Army procedures at Basin F is untenable because those procedures implicate the policy concerns underlying the CERCLA response actions. See Miller v. United States, 710 F.2d 656, 665 (10th Cir.) (claim that failure to warn of hazardous highway condition barred under the discretionary function exception because highway construction process infused with a "welter of public policy considerations"), cert. denied, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983). See also Zumwalt, 928 F.2d at 955-56 (discussing Miller ). The district court properly dismissed the failure to warn claim.
 
 IV. Strict Liability
 
 45
 In their fourth claim for relief, Plaintiffs assert that the activities at Basin F were ultrahazardous and that Shell therefore is strictly liable for any ensuing damages. Presenting the final issue in this appeal, defendant Shell contends that the district court erred in denying its motion to dismiss this claim by failing to heed the Colorado Court of Appeals' holding in Forrest v. Imperial Distribution Services, 712 P.2d 488, 491 (Colo.App.1985), rev'd on other grounds, 741 P.2d 1251 (Colo.1987).
 
 
 46
 Without discussing the facts of Forrest, Shell boldly asserts that it is dispositive of all hazardous wastes cases in Colorado. Underneath the conclusory rhetoric, however, lies the following progression:
 
 
 47
 (1) this court should follow the holding of an intermediate state court of appeals in determining how the highest state court would interpret a question of state law;
 
 
 48
 (2) the Colorado Court of Appeals held in Forrest that the defendant's delivery to a landfill of one fifteen gallon container of highly caustic liquid hazardous waste was not an ultrahazardous activity which would give rise to strict liability;
 
 
 49
 (3) therefore, Shell's generation, storage, treatment and disposal of millions of gallons of liquid hazardous wastes in a ninety-three acre impoundment within one-and-a-quarter miles of a residential neighborhood were not ultrahazardous activities which would give rise to strict liability.
 
 
 50
 We agree with the first prong of Shell's argument, for we always have viewed intermediate state court opinions as indicia of the leanings of the state's highest court and have followed suit "unless other authority convinces [us] that the state supreme court would decide otherwise." Delano v. Kitch, 663 F.2d 990, 996 (10th Cir.1981), cert. denied, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). See also West v. American Tel. & Tel. Co., 311 U.S. 223, 236-37, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940); Quezada v. County of Bernalillo, 944 F.2d 710, 719 (10th Cir.1991). Our problem is with the huge logic leap from fifteen gallon container in Forrest to the ninety-three acre lake in this case.
 
 
 51
 The Forrest plaintiff, a landfill employee, suffered disabling injuries when a coworker bulldozed the defendant's waste container, causing it to explode and spray caustic liquid in the plaintiff's face and eyes. The Colorado Court of Appeals refused to extend the doctrine of strict liability for abnormally dangerous activities to the situation, speaking to the issue in whole as follows:
 
 
 52
 We disagree with the plaintiffs' contention that the trial court also erred in refusing their tendered instructions on ultrahazardous activities. In Colorado, strict liability for ultrahazardous activities has been imposed only in cases involving blasting with dynamite, see, e.g., Garden of the Gods Village, Inc. v. Hellman, 133 Colo. 286, 294 P.2d 597 (1956), and impounding of water, see e.g., Garnet Ditch & Reservoir Co. v. Sampson, 48 Colo. 285, 110 P. 79 (1910). And, we perceive no basis upon which we may extend the doctrine to the activities complained of here.
 
 
 53
 Forrest, 712 P.2d at 491 (emphasis supplied). We do not read this brief paragraph as a foreclosure of the strict liability for the generation, treatment, storage and disposal of every conceivable type of hazardous waste regardless of the circumstances. As is evident from the emphasized language, the Court of Appeals limited its holding to the "activities complained of," and those activities bear resemblance to the allegations in Plaintiffs' complaint only to the extent that both involve the generic term "hazardous wastes."
 
 
 54
 Perhaps the Court of Appeals limited its holding because it was familiar with the Restatement (Second) of Torts (1977), which provides the most recognized legal framework for ultrahazardous strict liability claims. See Hartford Fire Ins. Co. v. Public Service Co., 676 P.2d 25, 27 (Colo.App.1983) (wherein the same appeals court judge held that power transmission was not an ultrahazardous activity under §§ 519 and 520). Actually the Restatement (Second) § 519 provides for strict liability for "abnormally dangerous" activities, but we will use the term "ultrahazardous" as used by Plaintiffs in the complaint and by the Court of Appeals in Forrest and Hartford Fire Ins.[12] Section 520 lists six factors to weigh in determining whether an activity should give rise to strict liability under § 519. Under § 520, a court considers the:
 
 
 55
 (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
 
 
 56
 (b) likelihood that the harm that results from it will be great;
 
 
 57
 (c) inability to eliminate the risk by the exercise of reasonable care;
 
 
 58
 (d) extent to which the activity is not a matter of common usage;
 
 
 59
 (f) inappropriateness of the activity to the place where it is carried on; and
 
 
 60
 (g) extent to which its value to the community is outweighed by its dangerous attributes.
 
 
 61
 Id. These factors require a particularized inquiry. Even blasting, the activity most commonly recognized as ultrahazardous, see, e.g., Garden of the Gods Village, 133 Colo. 286, 294 P.2d 597, may not give rise to strict liability if conducted in an appropriate locale far away from human habitation or anything of value. See Restatement (Second) § 520, comment j. To impose an inflexible strict liability rule on all blasting without consideration of the circumstances would be just as incorrect as Shell's assertion of the opposite rule regarding hazardous wastes. We do not think the Forrest court purported to establish such a rule.
 
 
 62
 Shell has not addressed the Restatement (Second) rule in the context of its activities at Basin F as alleged in the complaint, nor has it disputed Plaintiffs' assertion that the Colorado courts traditionally look to the Restatement for guidance. See, e.g., Perreira v. Colorado, 768 P.2d 1198 (Colo.1989); Smith v. Home Light & Power Co., 734 P.2d 1051 (Colo.1987). Shell merely points to Forrest as a dispositive general rule. But Shell can point to nothing in Forrest or the cases cited therein, Garden of the Gods Village and Garnet Ditch and Reservoir, which would indicate that the law regarding ultrahazardous activities is static in Colorado,[13] and we see no reason why Colorado courts would not apply the restatement to a new situation such as the ninety-three acre toxic lake at Basin F. Plaintiffs and the district court below have cited New Jersey Dep't of Environmental Protection v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (1983), in which the New Jersey Supreme Court applied the Restatement test and held that the defendant could be held strictly liable for injuries suffered by neighboring landowners as a result of the defendant's storage and disposal of mercury, an abnormally dangerous activity. Id. at 157-59. Upon examining the Plaintiffs' complaint in the light of this authority we think that Plaintiffs have alleged facts that may establish that Shell engaged in an ultrahazardous activity or, to use the proper term under the Restatement (Second), an abnormally dangerous activity. We therefore affirm the district court order denying Shell's motion to dismiss. See Conley v. Gibson, 355 U.S. at 45-46, 78 S.Ct. at 102.
 
 
 63
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 The Arsenal is among the federal sites grouped as the number two priority on the National Priorities List (NPL), an EPA compiled list which prioritizes CERCLA sites for cleanup based on the relative risk or danger to public health or welfare or the environment. See CERCLA § 105(a)(8); 42 U.S.C.A. 9605(a)(8). The list is published at 40 C.F.R. pt. 300 app. B (1991)
 
 
 [2]
 CERCLA § 104 authorizes the President to respond to threatened or actual hazardous waste releases. See 42 U.S.C.A. § 9604(a)(1). The Army's actions at Basin F, under the supervision of EPA and in joint agreement with Shell, were taken pursuant to this overall grant of authority. See Executive Order No. 12580 52 Fed.Reg. 2923 (1987) (delegating CERCLA response authority to EPA, and for military institutions such as the Arsenal, to the Secretary of Defense)
 
 
 [3]
 Donald Campbell, Deputy Program Manager for the Army, stated the Army's position and described its actions as follows:
 During the Basin F IRA, the process of exposing sludges and soils which had been covered by liquid for over 30 years and drying them so that they might be placed in the wastepile resulted in the release of strong odors at the Basin and in nearby communities. In close coordination with EPA, Shell and Colorado State agencies, the Army took steps to mitigate the odors and make sure that they did not create a long-term health risk to anyone in the vicinity. The following recommendations made by the State of Colorado were implemented, including (a) acceleration of removal activities and schedules, (b) the covering of exposed areas during shutdown periods, (c) the termination of all excavation activities at the site on December 12, 1988, and (d) the expeditious capping of the wastepile and the basin floor. Also, air monitoring was expanded during the period of concern, and a 24-hour response team was organized. The Army assisted the Tri-County Health Department in this effort. The Army distributed air purifiers to any local resident who requested one in order to minimize discomfort. The PMO requested and obtained the services of the Army Environmental Health Agency ("AEHA") which conducted a study of the Basin F odors. All parties agree that the odors presented no long-term health risks to the community. At the request of EPA and the Army, the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") is conducting a health consultation in order to independently ascertain any need for further study of potential, long-term health effects. Shell has offered free medical examinations for all concerned citizens. EPA, Shell, and the Army continue to agree that, pending the results of these follow-up activities, the odors caused by the Basin F IRA were a source of intermittent discomfort which were outweighed by the long-term benefit to the community of the removal activity conducted at Basin F.
 Applt. app. at 350-51.
 
 
 [4]
 Whether the costs are "consistent with the national contingency plan" as required by the latter part of subsection (B) is not in issue. The National Contingency Plan (NCP) is a body of procedural and substantive guidelines which governs CERCLA cleanup actions. See CERCLA § 105, 42 U.S.C. § 9605. It is published at 40 C.F.R. pt. 300 (1991)
 
 
 [5]
 The statute concludes as follows:
 The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.
 42 U.S.C.A. § 9601(24).
 
 
 [6]
 See Exxon Corp. v. Hunt, 475 U.S. at 366-67 n. 8, 106 S.Ct. at 1111 n. 8 for a concise account of the various bills considered by Congress in the evolution of CERCLA
 
 
 [7]
 Representative Gore, in additional views to the committee report on H.R. 7020, expressed dismay at "the drastic whittling down of the original liability provisions...." H.R.Rep. No. 96-1016, pt. I, at 62-65 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6139-41. In the Senate, Senators Mitchell and Williams made similar remarks regarding the compromise bill's lack of compensation for personal injury. See 126 Cong.Rec. 30941 and 30970 (Nov. 24, 1980)
 
 
 [8]
 Plaintiffs' six FTCA claims are identical to the tort claims against Shell, as the first amended complaint merely added the Government as a codefendant. The six claims are for negligence, nuisance, trespass, strict liability for an ultrahazardous activity, intentional infliction of emotional distress and negligent infliction of emotional distress. See First Amended Complaint pp 120-178. But each claim amounts to a challenge to the Army's execution of the Basin F IRA and its failure to warn. Id
 
 
 [9]
 Plaintiffs argue that the Army failed to maintain a current contingency plan for emergency hazardous waste releases. See 40 C.F.R. § 264.54-264.56 (RCRA regulations). They also contend that the Army violated federal and Colorado air pollution standards. See 40 C.F.R. §§ 50.2(b), 50.6 & 50.7 (Clean Air Act standards, 42 U.S.C.A. § 7401 et seq.); 5 C.C.R. 1001-3, Pt. III(D)(2)(b)(iii) (Colorado Air Pollution Control Commission Regulations)
 
 
 [10]
 See also The Law of Hazardous Waste § 12.03[c] ("[T]he statute's basic goal is to protect public health and the environment from the risks posed by hazardous waste sites.") (citing legislative history as well as numerous CERCLA provisions which expressly mention health and safety)
 
 
 [11]
 After this case was argued, the Ninth Circuit held that it is the Government's burden to adduce evidence on summary judgment which would establish the exceptions to the FTCA waiver of sovereign immunity. Prescott v. United States, 959 F.2d 793 (9th Cir.1992). See also Carlyle v. United States, 674 F.2d 554 (6th Cir.1982); Stewart v. United States, 199 F.2d 517, 520 (7th Cir.1952). This rule applies, however, only if the complaint alleges facts which do not obviously place the claim inside one of the exceptions. Prescott, 959 F.2d at 797-98 (citing Carlyle, 674 F.2d at 556). In this case, we need not decide the evidentiary burden issue because we deem the Plaintiffs' complaint facially defective
 
 
 [12]
 The term "ultrahazardous" is a carryover from the first restatement. See Restatement of Torts § 519 (1938). The Court of Appeals nevertheless cited the Restatement (Second) and we assume that the court followed the latter version
 
 
 [13]
 Shell cited without discussion one case in which the Colorado Supreme Court refused to extend the Garden of the Gods holding regarding blasting to the storage of dynamite. See Liber v. Flor, 160 Colo. 7, 415 P.2d 332 (1966). We do not think Liber indicates a resistance to the Restatement (Second) §§ 519 and 520 test, however. Liber took place when the Restatement (Second) was only in draft form, eleven years before it was officially adopted by the American Law Institute in 1977. Since 1977 substantial development has occurred in the law of strict liability for abnormally dangerous activities. See City of Northglenn v. Chevron U.S.A., Inc., 519 F.Supp. 515 (D.Colo.1981) (interpreting Colorado law as allowing claim for strict liability under Restatement (Second) §§ 519-520 for damages resulting from storage of gasoline, distinguishing Liber and noting substantial development in the law)