990 F.2d 1565
 36 ERC 1377, 61 USLW 2620, 23 Envtl.
L. Rep. 20,800
 UNITED STATES of America, Plaintiff-Appellee,
v.
STATE OF COLORADO and Colorado Department of Health,
Defendants-Appellants.
State of Alaska, State of Arkansas, State of California,
State of Connecticut, State of Indiana, State of Iowa, State
of Kansas, Commonwealth of Kentucky, State of Michigan,
State of Minnesota, State of Missouri, State of Nebraska,
State of Nevada, State of New Mexico, State of New York,
State of North Carolina, State of Ohio, State of Oregon,
Commonwealth of Pennsylvania, State of Tennessee, State of
Utah, and State of Wyoming, Amici Curiae.
 No. 91-1360.
 United States Court of Appeals,
Tenth Circuit.
 April 6, 1993.
Rehearing Denied June 30, 1993.
 
 Gale A. Norton, Atty. Gen., State of CO (Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Patricia S. Bangert, Deputy Atty. Gen., Lynn B. Obernyer, First Asst. Atty. Gen., Natural Resources Section, Casey A. Shpall, First Asst. Atty. Gen., Laura E. Perrault, Asst. Atty. Gen., CERCLA Litigation Unit, with her, on the briefs), Denver, CO, for defendants-appellants.
 John T. Stahr, Atty., Dept. of Justice, Environment and Natural Resources Div. (Roger Clegg, Acting Asst. Atty. Gen., David C. Shilton, Bradley S. Bridgewater, Attys., Dept. of Justice, Environment and Natural Resources Div., with him, on the brief), Washington, D.C., for plaintiff-appellee.
 Lee Fisher, Atty. Gen., State of OH, and Jack A. Van Kley, Asst. Atty. Gen., Environmental Enforcement Section, State of OH, Columbus, OH, filed a brief on behalf of amici curiae. Charles E. Cole, Atty. Gen., State of AK, Juneau, AK, Winston Bryant, Atty. Gen., State of AR, Little Rock, AR, Daniel E. Lungren, Atty. Gen., State of CA, Theodora Berger, Roderick E. Walston, Walter E. Wunderlich, Sara J. Russell, and Richard Tom, Los Angeles, CA, Richard Blumenthal, Atty. Gen., State of CT, Hartford, CT, Linley E. Pearson, Atty. Gen., State of IN, Indianapolis, IN, Bonnie J. Campbell, Atty. Gen., State of IA, Des Moines, IA, Robert T. Stephan, Atty. Gen., State of KS, Topeka, KS, Randall G. McDowell, Manager, Natural Resources and Environmental Protection Cabinet, Com. of KY, Frankfort, KY, Frank J. Kelley, Atty. Gen., State of MI, Lansing, MI, Hubert H. Humphrey, III, Atty. Gen., State of MN, and Stephan Shakman, St. Paul, MN, William L. Webster, Atty. Gen., State of MO, and Shelley A. Woods, Jefferson City, MO, Don Stenberg, Atty. Gen., State of NE, Lincoln, NE, Frankie Sue Del Papa, Atty. Gen., State of NV, Carson City, NV, Tom Udall, Atty. Gen., State of NM, Santa Fe, NM, Robert Abrams, Atty. Gen., State of NY, and Nancy Stearns, New York State Dept. of Law, Environmental Protection Bureau, New York City, Lacy H. Thornburg, Atty. Gen., State of NC, Raleigh, NC, Charles S. Crookham, Atty. Gen., State of OR, Salem, OR, Ernest D. Preate, Jr., Atty. Gen., Com. of PA, and Donald A. Brown, Director, Office of Chief Counsel, Bureau of Hazardous Sites & Superfund Enforcement, Harrisburg, PA, Charles W. Burson, Atty. Gen., State of TN, Nashville, TN, Paul Van Dam, Atty. Gen., State of UT, and Jan Graham, Sol. Gen., Salt Lake City, UT, and Joseph B. Meyer, Atty. Gen., State of WY, Cheyenne, WY, appeared on behalf of amici curiae.
 Before BALDOCK and HOLLOWAY, Circuit Judges, and EARL E. O'CONNOR, Senior District Judge.*
 BALDOCK, Circuit Judge.
 
 
 1
 This case examines the relationship between the Resource Conservation and Recovery Act of 1976 ("RCRA"), Pub.L. No. 94-580, 90 Stat. 2795, as amended by the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), Pub.L. No. 98-616, 98 Stat. 3221 (codified as amended at 42 U.S.C. §§ 6901-6981 (West 1983 & Supp.1992)), and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96-510, 94 Stat. 2767, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99-499, 100 Stat. 1613 (codified as amended at 42 U.S.C. §§ 9601-9675 (West 1983 & Supp.1992) and 26 U.S.C. § 9507 (West Supp.1992)). At issue is whether a state which has been authorized by the Environmental Protection Agency ("EPA") to "carry out" the state's hazardous waste program "in lieu of" RCRA, see 42 U.S.C. § 6926(b) (West Supp.1992), is precluded from doing so at a hazardous waste treatment, storage and disposal facility owned and operated by the federal government which the EPA has placed on the national priority list, see id. § 9605(a)(8)(B), and where a CERCLA response action is underway. See 42 U.S.C. § 9604 (West 1983 & Supp.1992).
 
 I.
 
 2
 The Rocky Mountain Arsenal ("Arsenal") is a hazardous waste treatment, storage and disposal facility subject to RCRA regulation, see 42 U.S.C. § 6924(a) (West Supp.1992), which is located near Commerce City, Colorado in the Denver metropolitan area. The United States government has owned the Arsenal since 1942, and the Army operated it from that time until the mid-1980's. Without reiterating its environmental history, suffice it to say that the Arsenal is "one of the worst hazardous waste pollution sites in the country." Daigle v. Shell Oil Co., 972 F.2d 1527, 1531 (10th Cir.1992) (footnote omitted). The present litigation focuses on Basin F which is a 92.7 acre basin located within the Arsenal where millions of gallons of liquid hazardous waste have been disposed of over the years.
 
 A.
 
 3
 Congress enacted RCRA in 1976 "to assist the cities, counties and states in the solution of the discarded materials problem and to provide nationwide protection against the dangers of improper hazardous waste disposal." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 11 (1976), reprinted in 1976 U.S.C.C.A.N. 6238, 6249. RCRA requires the EPA to establish performance standards, applicable to owners and operators of hazardous waste treatment, storage and disposal facilities "as may be necessary to protect human health and the environment."[1] 42 U.S.C. § 6924(a) (West Supp.1992). The EPA enforces RCRA standards by requiring owners and operators of facilities to obtain permits,[2] see 42 U.S.C. § 6925 (West 1983 & Supp.1992), and by issuing administrative compliance orders and seeking civil and criminal penalties for violations. Id. § 6928. The EPA may authorize states to "carry out" their own hazardous waste programs "in lieu of" RCRA and to "issue and enforce permits for the storage, treatment, or disposal of hazardous waste" so long as the state program meets the minimum federal standards.[3] 42 U.S.C. § 6926(b) (West Supp.1992). See also H.R.Rep. No. 1491(I) at 32, reprinted in 1976 U.S.C.C.A.N. at 6270 (under RCRA, states retain "primary authority" to implement hazardous waste programs). However, RCRA does not preclude a state from adopting more stringent requirements for the treatment, storage and disposal of hazardous waste. 42 U.S.C. § 6929 (West Supp.1992). See also Old Bridge Chems., Inc. v. New Jersey Dep't of Envtl. Protection, 965 F.2d 1287, 1296 (3d Cir.) ("RCRA sets a floor not a ceiling for state regulation of hazardous wastes"), cert. denied, --- U.S. ----, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992). Once the EPA authorizes a state to carry out the state hazardous waste program in lieu of RCRA, "[a]ny action taken by [the] State [has] the same force and effect as action taken by the [EPA]...." 42 U.S.C. § 6926(d) (West 1983). The federal government must comply with RCRA or an EPA-authorized state program "to the same extent as any person...."[4] 42 U.S.C. § 6961 (West 1983). In short, RCRA provides "a prospective cradle-to-grave regulatory regime governing the movement of hazardous waste in our society."[5] H.R.Rep. No. 1016(I), 96th Cong., 2d Sess. 17 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6120. See also Old Bridge, 965 F.2d at 1292 (RCRA is "principal federal statute regulating the generation, transportation, and disposal of hazardous wastes").
 
 B.
 
 4
 Because RCRA only applied prospectively, it was "clearly inadequate" to deal with " 'the inactive hazardous waste site problem.' " H.R.Rep. No. 1016(I), at 17-18, reprinted in 1980 U.S.C.C.A.N. at 6120. Consequently, Congress enacted CERCLA in 1980 "to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste disposal sites." Id. at 22, reprinted in 1980 U.S.C.C.A.N. at 6125. Among its provisions, CERCLA required the President to revise the "national contingency plan for the removal of ... hazardous substances" which would "establish procedures and standards for responding to releases of hazardous substances...." 42 U.S.C. § 9605(a) (West Supp.1992). See also 40 C.F.R. pt. 300 (1992). When "any hazardous substance is released or there is a substantial threat of such a release into the environment," CERCLA authorizes the President to
 
 
 5
 act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance ... at any time ... or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment.
 
 
 6
 42 U.S.C. § 9604(a)(1) (West Supp.1992). CERCLA finances these government response actions through the Hazardous Substance Superfund, see id. § 9611(a)(1); 26 U.S.C. § 9507 (West Supp.1992), and permits the government to seek reimbursement from responsible parties by holding them strictly liable. Id. § 9607(a). See also H.R.Rep. No. 1016, at 17, 1980 U.S.C.C.A.N. at 6120 (CERCLA establishes "a Federal cause of action in strict liability to enable [the EPA] to pursue rapid recovery of the costs ... of [response] actions"). See, e.g., United States v. Hardage, 982 F.2d 1436, 1443 (10th Cir.1992). CERCLA also requires the President to develop a national priority list, as part of the national contingency plan, which identifies "priorities among releases or threatened releases throughout the United States" for government response actions, id. § 9605(a)(8). See 40 C.F.R. pt. 300 app. B (1992), and the listing of a particular site on the national priority list is a prerequisite to a Superfund-financed remedial action at the site. 40 C.F.R. § 300.425(b)(1) (1992). We note that Superfund monies cannot be used for remedial actions at federal facilities, 42 U.S.C. § 9611(e)(3) (West Supp.1992), but CERCLA otherwise applies to the federal government "to the same extent, both procedurally and substantively, as any nongovernmental entity." Id. § 9620(a)(1). In short, CERCLA is a remedial statute "designed to facilitate cleanup of environmental contamination caused by releases of hazardous substances."[6] Colorado v. Idarado Mining Co., 916 F.2d 1486, 1488, 1492 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991). See also Daigle, 972 F.2d at 1533.
 
 II.
 
 7
 In November 1980, the Army, as the operator of the Arsenal, submitted to the EPA part A of its RCRA permit application[7] which listed Basin F as a hazardous waste surface impoundment.[8] Appellants' App. at 413. By submitting the part A RCRA application, the Army achieved RCRA interim status. See supra note 2. In May 1983, the Army submitted part B of its RCRA permit application to the EPA which included a required closure plan for Basin F, Appellants' App. at 505, and the following month, the Army submitted a revised closure plan for Basin F. Appellants' App. at 471. See also supra notes 1 and 7. In May 1984, the EPA issued a notice of deficiency to the Army regarding part B of its RCRA permit application and requested a revised part B application within sixty days under threat of termination of the Army's interim status. Appellants' Br. Attach. 12. The Army never submitted a revised part B RCRA permit application to the EPA; rather, in October 1984, the Army commenced a CERCLA remedial investigation/feasibility study ("RI/FS").[9] Appellee's App. at 9, 30.
 
 
 8
 Effective November 2, 1984, the EPA, acting pursuant to 42 U.S.C. § 6926(b) (West Supp.1992), authorized Colorado to "carry out" the Colorado Hazardous Waste Management Act ("CHWMA"), Colo.Rev.Stat. §§ 25-15-301 to 25-15-316 (1989 & Supp.1992), "in lieu of" RCRA. See 49 Fed.Reg. 41,036 (1984). That same month, the Army submitted its part B RCRA/CHWMA permit application to the Colorado Department of Health ("CDH") which is charged with the administration and enforcement of CHWMA. Appellants' App. at 473. Notably, the part B application was the same deficient application that the Army submitted to the EPA in June 1983. Id. Not surprisingly, CDH found the application, specifically the closure plan for Basin F, to be unsatisfactory. Id.
 
 
 9
 Consequently, in May 1986, CDH issued its own draft partial closure plan for Basin F to the Army, id. at 481, and in October 1986, CDH issued a final RCRA/CHWMA modified closure plan for Basin F and requested the Army's cooperation in immediately implementing the plan. Id. at 393. The Army responded by questioning CDH's jurisdiction over the Basin F cleanup. Id. at 395-96.
 
 
 10
 In response to the Army's indication that it would not implement CDH's closure plan for Basin F, Colorado filed suit in state court in November 1986. Colorado sought injunctive relief to halt the Army's alleged present and future violations of CHWMA and to enforce CDH's closure plan for Basin F. The Army removed the action to federal district court, and moved to dismiss Colorado's CHWMA enforcement action claiming that "CERCLA's enforcement and response provisions pre-empt and preclude a state RCRA enforcement action with respect to the cleanup of hazardous wastes at the Arsenal." Colorado v. United States Dept. of the Army, 707 F.Supp. 1562, 1565 (D.Colo.1989).
 
 
 11
 In June 1986, the Army announced that it was taking a CERCLA interim response action with respect to Basin F. Appellee's App. at 20. In September 1986, the Army agreed with Shell Chemical Company[10] on an interim response action in which Shell would construct storage tanks with a total capacity of four million gallons to hold Basin F liquids. Id. In June 1987, the Army, the EPA, Shell and Colorado agreed on a Basin F interim response action which required the Army to remove contaminated liquids to the temporary storage tanks and contaminated sludges and soils to a temporary holding area until determination of a final Arsenal-wide remedy. Id. at 47-50. In August 1987, the Army requested that Colorado identify potential applicable or relevant and appropriate requirements ("ARAR's"), see 42 U.S.C. § 9621(d) (West Supp.1992); infra note 20, for the Basin F interim response action, and, in October 1987, the Army requested comment on its plan, see 42 U.S.C. § 9621(f)(1)(E) (West Supp.1992); however, Colorado did not respond to either of these requests. Appellee's App. at 21-22.
 
 
 12
 In October 1987, the Army advised Colorado that it was withdrawing its still pending part B RCRA/CHWMA permit application claiming that it was ceasing operations of all structures addressed in the application and that it intended to remediate Basin F pursuant to CERCLA. Appellants' App. at 398-400. The Army indicated that it would, however, comply with RCRA and CHWMA in accordance with CERCLA's provisions at 42 U.S.C. § 9620(i) and § 9621(d)(2)(A)(i). Id. at 399.
 
 
 13
 In December 1987, the Army transmitted a draft decision document for the Basin F interim response action to the EPA, Shell and Colorado and initiated a thirty day public comment period, see 42 U.S.C. § 9617 (West Supp.1992). Appellee's App. at 22. In January 1988, the Army issued its decision document for the Basin F interim response action. Appellants' App. at 5. Thereafter, the Army began the Basin F interim response action, and, in December 1988, completed the removal of eight million gallons of hazardous liquid wastes from Basin F, relocating four million gallons to three lined storage tanks and four million gallons to a double-lined holding pond. Appellee's App. at 12. In addition, the Army removed 500,000 cubic yards of contaminated solid material from Basin F, dried it, and placed it in a sixteen acre, double lined, capped wastepile. Id. The Army also capped the Basin F floor.[11] Id.
 
 
 14
 In February 1989, the federal district court denied the Army's motion to dismiss Colorado's CHWMA enforcement action. The district court relied on several provisions of both RCRA and CERCLA, including CERCLA's provision for the application of state laws concerning removal and remedial action at federal facilities not listed on the national priority list.[12] Colorado v. United States Dep't of the Army, 707 F.Supp. at 1569-70 (citing 42 U.S.C. § 9620(a)(4)). The district court found this provision to be particularly noteworthy in light of the fact that Basin F was not listed on the national priority list. Id. Furthermore, the district court expressed particular concern about the relationship between the Army and the EPA, noting that the EPA's "potential monitoring of the Army's Basin F cleanup operation under CERCLA does not serve as an appropriate or effective check on the Army's efforts,"[13] and that Colorado's involvement "would guarantee the salutary effect of a truly adversary proceeding that would be more likely, in the long run, to achieve a thorough cleanup." Id. at 1570. Thus, the district court held that Colorado was not precluded from enforcing CHWMA, pursuant to its EPA-delegated RCRA authority, despite the Army's cleanup efforts under CERCLA. Id.
 
 
 15
 In March 1989, the month following the district court's order, the EPA added Basin F to the national priority list.[14] 54 Fed.Reg. 10,512 (1989). The Army immediately moved for reconsideration of the district court's order in light of the EPA's listing of Basin F on the national priority list.
 
 
 16
 In September 1989, CDH, acting in accordance with the district court's February 1989 order, issued a final amended compliance order to the Army, pursuant to CDH's authority under CHWMA. The final amended compliance order requires the Army to submit an amended Basin F closure plan, as well as plans and schedules addressing soil contamination, monitoring and mitigation, groundwater contamination, and other identified tasks for each unit containing Basin F hazardous waste as required under CHWMA. Appellants' App. at 96-103. The final amended compliance order also requires that CDH shall approve all plans and that the Army shall not implement any closure plan or work plan prior to approval in accordance with CHWMA. Id. at 98.
 
 
 17
 As a result of the final amended compliance order, the United States filed the present declaratory action, invoking the district court's jurisdiction under 28 U.S.C. § 2201. The United States' complaint sought an order from the federal district court declaring that the final amended compliance order is "null and void" and enjoining Colorado and CDH from taking any action to enforce it.[15] Id. at 13. Colorado counterclaimed requesting an injunction to enforce the final amended compliance order.[16] Id. at 35-41. On cross motions for summary judgment, the district court relied on CERCLA's provision which limits federal court jurisdiction to review challenges to CERCLA response actions, see 42 U.S.C. § 9613(h) (West Supp.1992), and held that "[a]ny attempt by Colorado to enforce [ ] CHWMA would require [the] court to review the [Army's CERCLA] remedial action ... prior to [its] completion" and that "[s]uch a review is expressly prohibited by [CERCLA] § 9613(h)." United States v. Colorado, No. 89-C-1646, slip op. at 10 (D.Colo. Aug. 14, 1991) (Mem. Order & Op.). It is important to note that the district court distinguished its earlier order, which held that Colorado could enforce CHWMA despite the Army's CERCLA response action, Colorado v. United States Dep't of the Army, 707 F.Supp. at 1570, based on the EPA's intervening listing of Basin F on the national priority list. United States v. Colorado, No. 89-C-1646, slip op. at 4, 8, 1991 WL 193519. In doing so, the district court appears to have implicitly relied on § 9620(a)(4), which provides for the application of state laws concerning removal and remedial action at federal facilities not listed on the national priority list, in addition to § 9613(h). Based on this reasoning, the district court granted summary judgment to the United States on its claims for declaratory and injunctive relief, denied Colorado's cross-motion for summary judgment, and enjoined Colorado and CDH from taking "any action to enforce the [ ] final amended compliance order." Id. at 10-11.
 
 III.
 
 18
 Colorado filed a timely notice of appeal from the district court's order giving us jurisdiction over this matter. 28 U.S.C. § 1291. Colorado contends that § 9613(h) is not applicable to a state's efforts to enforce its EPA-delegated RCRA authority, that listing on the national priority list is immaterial, and that the district court's order amounts to a determination that CERCLA preempts a state's EPA-delegated RCRA authority contrary to well-settled principles.[17] In addition to arguing that § 9613(h) bars Colorado from enforcing its EPA-delegated RCRA authority, the United States alternatively contends that CERCLA's provision, which grants the President authority to select the remedy and allow for state input through the ARAR's process, see 42 U.S.C. § 9621 (West Supp.1992), bars Colorado from enforcing state law independent of CERCLA. See Hill v. Ibarra, 954 F.2d 1516, 1525 n. 4 (10th Cir.1992) ("grant of summary judgment ... may be upheld on any grounds supported by the record").
 
 
 19
 We review a district court order granting or denying summary judgment de novo, applying the same standard as the district court. United States v. Hardage, 985 F.2d 1427, 1432 (10th Cir.1993). Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, we construe the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Hardage, 985 F.2d at 1433.
 
 
 20
 As this is a case of statutory construction, our job is to effectuate the intent of Congress. Colorado v. Idarado Mining Co., 916 F.2d 1486, 1494 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991). While our starting point is the statutory language, Hallstrom v. Tillamook County, 493 U.S. 20, 25, 28-29, 110 S.Ct. 304, 308, 309-311, 107 L.Ed.2d 237 (1989), we must also look to the design of the statute as a whole and to its object and policy. Crandon v. United States, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990). See also King v. St. Vincent's Hosp., --- U.S. ----, ----, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) (statute must be read as a whole because "meaning, plain or not, depends on context"). When Congress has enacted two statutes which appear to conflict, we must attempt to construe their provisions harmoniously. Negonsott v. Samuels, 933 F.2d 818, 819 (10th Cir.1991), aff'd, --- U.S. ----, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993). See also County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation, --- U.S. ----, ----, 112 S.Ct. 683, 692, 116 L.Ed.2d 687 (1992) ("Courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is [our] duty ... absent clearly expressed congressional intention to the contrary, to regard each as effective."). Even when a later enacted statute is not entirely harmonious with an earlier one, we are reluctant to find repeal by implication unless the text or legislative history of the later statute shows that Congress intended to repeal the earlier statute and simply failed to do so expressly. United States v. Barrett, 837 F.2d 933, 934 (10th Cir.1988). See also Kremer v. Chemical Constr. Corp., 456 U.S. 461, 470, 102 S.Ct. 1883, 1892, 72 L.Ed.2d 262 (1982) ("an implied repeal must ordinarily be evident from the language or operation of the statute"). We turn now to the application of these well-settled rules of statutory construction to this particular case.
 
 IV.
 
 21
 The district court focused on CERCLA's provision governing civil proceedings which grants federal courts exclusive jurisdiction over all actions arising under CERCLA. 42 U.S.C. § 9613(b) (West Supp.1992). As the district court recognized, § 9613(h) expressly limits this grant of jurisdiction by providing, with exceptions not relevant here, that "[n]o Federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action selected under section 9604 of this title...." Id. § 9613(h). However, contrary to the district court's reasoning, § 9613(h) does not bar federal courts from reviewing a CERCLA response action prior to its completion; rather, it bars federal courts from reviewing any "challenges" to CERCLA response actions. This is a critical distinction because an action by Colorado to enforce the final amended compliance order, issued pursuant to its EPA-delegated RCRA authority, is not a "challenge" to the Army's CERCLA response action. To hold otherwise would require us to ignore the plain language and structure of both CERCLA and RCRA, and to find that CERCLA implicitly repealed RCRA's enforcement provisions contrary to Congress' expressed intention.
 
 A.
 
 22
 Congress clearly expressed its intent that CERCLA should work in conjunction with other federal and state hazardous waste laws in order to solve this country's hazardous waste cleanup problem. CERCLA's "savings provision" provides that "[n]othing in [CERCLA] shall affect or modify in any way the obligations or liabilities of any person[18] under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." 42 U.S.C. § 9652(d) (West 1983). Similarly, CERCLA's provision entitled "relationship to other laws" provides that "[n]othing in [CERCLA] shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State." 42 U.S.C. § 9614(a) (West 1983). By holding that § 9613(h) bars Colorado from enforcing CHWMA, the district court effectively modified the Army's obligations and liabilities under CHWMA contrary to § 9652(d), and preempted Colorado from imposing additional requirements with respect to the release of hazardous substances contrary to § 9614(a).
 
 
 23
 As a federal facility, the Arsenal is subject to regulation under RCRA. See 42 U.S.C. § 6961 (West 1983). More importantly, because the EPA has delegated RCRA authority to Colorado, the Arsenal is subject to regulation under CHWMA. Id. See also Parola v. Weinberger, 848 F.2d 956, 960 (9th Cir.1988) (§ 6961 "unambiguously subjects federal instrumentalities to state and local regulation"). While the President has authority to exempt federal facilities from complying with RCRA or respective state laws "if he determines it to be in the paramount interest of the United States," 42 U.S.C. § 6961 (West 1983), nothing in this record indicates that the Army has been granted such an exemption with respect to its activities at the Arsenal. Thus, Colorado has authority to enforce CHWMA at the Arsenal, and "[a]ny action taken by [Colorado] ... [has] the same force and effect as action taken by the [EPA]...." Id. § 6926(d).
 
 
 24
 Notwithstanding Colorado's RCRA authority over the Basin F cleanup, and CERCLA's express preservation of this authority, § 9613(h), which was enacted as part of SARA, limits federal court jurisdiction to review challenges to CERCLA response actions. Congress' expressed purpose in enacting § 9613(h) was "to prevent private responsible parties from filing dilatory, interim lawsuits which have the effect of slowing down or preventing the EPA's cleanup activities." H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 266 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2941 (emphasis added). Nonetheless, the language of § 9613(h) does not differentiate between challenges by private responsible parties and challenges by a state. Thus, to the extent a state seeks to challenge a CERCLA response action, the plain language of § 9613(h) would limit a federal court's jurisdiction to review such a challenge. See, e.g., Alabama v. EPA, 871 F.2d 1548, 1557 (11th Cir.), cert. denied, 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989).
 
 
 25
 Be that as it may, an action by a state to enforce its hazardous waste laws at a site undergoing a CERCLA response action is not necessarily a challenge to the CERCLA action. For example, CDH's final amended compliance order does not seek to halt the Army's Basin F interim response action; rather it merely seeks the Army's compliance with CHWMA during the course of the action, which includes CDH approval of the Basin F closure plan prior to implementation. Thus, Colorado is not seeking to delay the cleanup, but merely seeking to ensure that the cleanup is in accordance with state laws which the EPA has authorized Colorado to enforce under RCRA. In light of §§ 9652(d) and 9614(a), which expressly preserve a state's authority to undertake such action, we cannot say that Colorado's efforts to enforce its EPA-delegated RCRA authority is a challenge to the Army's undergoing CERCLA response action.
 
 
 26
 The United States relies principally on two cases to support its claim that § 9613(h) bars any action by Colorado to enforce the final amended compliance order. In Schalk v. Reilly, 900 F.2d 1091 (7th Cir.), cert. denied, 498 U.S. 981, 111 S.Ct. 509, 112 L.Ed.2d 521 (1990), the Seventh Circuit held that § 9613(h) barred private citizens from bringing a CERCLA citizen suit which challenged a consent decree between the EPA and a responsible party on the grounds that failure to prepare an environmental impact statement violated the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. 900 F.2d at 1095. Responding to the citizens' argument that they were not challenging the remedial action but rather merely asking that certain procedural requirements be met, the court held that "challenges to the procedure employed in selecting a remedy nevertheless impact the implementation of the remedy and result in the same delays Congress sought to avoid by passage of the statute; the statute necessarily bars these challenges." Id. at 1097.
 
 
 27
 While we do not doubt that Colorado's enforcement of the final amended compliance order will "impact the implementation" of the Army's CERCLA response action, we do not believe that this alone is enough to constitute a challenge to the action as contemplated under § 9613(h). The plaintiffs in Schalk were attempting to invoke the federal court's jurisdiction under CERCLA's citizen suit provision. See 42 U.S.C. § 9659 (West Supp.1992). While one of the exceptions to § 9613(h)'s jurisdictional bar is for CERCLA citizen suits, such suits "may not be brought with regard to a removal where a remedial action is to be undertaken at the site." Id. § 9613(h)(4). Thus, the CERCLA citizen suit in Schalk was jurisdictionally barred by the plain language of the statute. See 900 F.2d at 1095. Accord Alabama v. EPA, 871 F.2d at 1557. Unlike the plaintiffs in Schalk, Colorado has not asserted and need not assert jurisdiction under CERCLA's citizen suit provision to enforce the final amended compliance order; therefore, Schalk's reasoning does not apply.
 
 
 28
 Nonetheless, the plain language of § 9613(h) bars federal courts from exercising jurisdiction, not only under CERCLA, but under any federal law to review a challenge to a CERCLA remedial action. See 42 U.S.C. § 9613(h) (West Supp.1992). In Boarhead Corp. v. Erickson, 923 F.2d 1011 (3d Cir.1991), the Third Circuit held that § 9613(h) barred the federal court from exercising federal question jurisdiction, 28 U.S.C. § 1331, under the National Historic Preservation Act, 16 U.S.C. § 470 et seq., in an action which sought to stay the EPA's CERCLA response action pending determination of whether property qualified for historic site status. 923 F.2d at 1021.
 
 
 29
 Like Schalk, Boarhead is also distinguishable from the present case. First, the plaintiff in Boarhead was a responsible party under CERCLA; therefore, permitting the plaintiff's action to proceed would have been contrary to Congress' expressed intent in enacting § 9613(h). Moreover, the plaintiff's complaint in Boarhead sought to stay the CERCLA remedial action; thus, the plaintiff's action under the Preservation Act clearly constituted a challenge to the CERCLA remedial action. Boarhead, 923 F.2d at 1015. See also Alabama v. EPA, 871 F.2d at 1559 (plaintiff's prayer for relief seeking to enjoin the EPA from participating in CERCLA remedial action "belie[d]" plaintiff's assertion that it was not challenging the remedial action plan). Most importantly, the Boarhead court's application of § 9613(h) to the facts of that case did not "affect or modify in any way the obligations or liabilities" of a responsible party "under other Federal or State law ... with respect to releases of hazardous substances," see 42 U.S.C. § 9652(d) (West 1983), and did not "preempt[ ] [the] state from imposing any additional liability or requirements with respect to the release of hazardous substances." See id. § 9614(a). In light of the plain language of §§ 9652(d) and 9614(a), and our responsibility to give effect to all of CERCLA's provisions, Boarhead cannot control this case.
 
 B.
 
 30
 Not only is the district court's construction of § 9613(h) inconsistent with §§ 9652(d) and 9614(a) of CERCLA, it is also inconsistent with RCRA's citizen suit provision. See 42 U.S.C. § 6972 (West 1983 & Supp.1992). While CERCLA citizen suits cannot be brought prior to the completion of a CERCLA remedial action, Schalk, 900 F.2d at 1095, RCRA citizen suits to enforce its provisions at a site in which a CERCLA response action is underway can be brought prior to the completion of the CERCLA response action.
 
 
 31
 RCRA's citizen suit provision permits any person to commence a civil action against any other person, including the United States government or its agencies, to enforce "any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to" RCRA. 42 U.S.C. § 6972(a)(1)(A) (West Supp.1992). Such suits are prohibited if the EPA or the state has already "commenced and is diligently prosecuting" a RCRA enforcement action. Id. § 6972(b)(1)(B). See, e.g., Supporters to Oppose Pollution, Inc. v. Heritage Group, 973 F.2d 1320, 1323-24 (7th Cir.1992). Federal courts have jurisdiction over such suits and are authorized "to enforce the permit, standard, regulation, condition, requirement, prohibition, or order...." 42 U.S.C. § 6972(a) (West Supp.1992).
 
 
 32
 RCRA's citizen suit provision also permits any person to commence a civil action against any other person, including the United States government or its agencies, to abate an "imminent and substantial endangerment to health or the environment...." Id. § 6972(a)(1)(B). These types of RCRA citizen suits are prohibited, not only when the EPA is prosecuting a similar RCRA imminent hazard action pursuant to 42 U.S.C. § 6973, but also when the EPA is prosecuting a CERCLA abatement action pursuant to 42 U.S.C. § 9606; the EPA is engaged in a CERCLA removal action or has incurred costs to initiate a RI/FS and is "diligently proceeding" with a CERCLA remedial action pursuant to 42 U.S.C. § 9604; or the EPA has obtained a court order or issued an administrative order under CERCLA or RCRA pursuant to which a responsible party is conducting a removal action, RI/FS, or remedial action. Id. § 6972(b)(2)(B). Federal courts have jurisdiction over RCRA citizen imminent hazard suits and are authorized "to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste...." Id. § 6972(a).
 
 
 33
 By prohibiting RCRA citizen imminent hazard suits with respect to hazardous waste sites where a CERCLA response action is underway, while not prohibiting RCRA citizen enforcement suits with respect to such sites, Congress clearly intended that a CERCLA response action would not prohibit a RCRA citizen enforcement suit. Because the definition of "person" under RCRA includes a state, 42 U.S.C. § 6903(15) (West 1983), Colorado could enforce RCRA in federal court by relying on RCRA's citizen enforcement suit provision, 42 U.S.C. § 6972(a)(1) (West Supp.1992), provided that it complied with the requisite notice provisions. See id. § 6972(b)(1)(A). See also Hallstrom v. Tillamook County, 493 U.S. 20, 26, 110 S.Ct. 304, 309, 107 L.Ed.2d 237 (1989) ("compliance with ... notice provision is a mandatory ... condition precedent for suit"). Because CHWMA became "effective" pursuant the EPA's delegation of RCRA authority to Colorado, and the final amended compliance order was issued pursuant to CHWMA, Colorado could arguably seek enforcement of the final amended compliance order in federal court pursuant to § 6972(a)(1). However, we need not decide this issue. While Colorado's counterclaim sought enforcement of the final amended compliance order in the district court, Colorado asserted the counterclaim solely under CHWMA, claiming that it was compulsory pursuant to Fed.R.Civ.P. 13(a), and seeking to invoke the district court's ancillary jurisdiction. See Appellants' App. at 30. Thus, we do not express any opinion on whether federal court jurisdiction over Colorado's counterclaim is proper under § 6972(a)(1)(A). Nonetheless, our discussion of this provision is relevant to our determination that Congress did not intend a CERCLA response action to bar a RCRA enforcement action, or an equivalent action by a state which has been authorized by EPA to enforce its state hazardous waste laws in lieu of RCRA.
 
 C.
 
 34
 Rather than challenging the Army's CERCLA remedial action, Colorado is attempting to enforce the requirements of its federally authorized hazardous waste laws and regulations, consistent with its ongoing duty to protect the health and environment of its citizens. CERCLA itself recognizes that these requirements are applicable to a facility during the pendency of a CERCLA response action. See Moskal v. United States, 498 U.S. 103, 109-10, 111 S.Ct. 461, 465-66, 112 L.Ed.2d 449 (1990) (statutes must be construed to give effect to "every clause and word"). Further, RCRA contemplates that enforcement actions may be maintained despite an ongoing CERCLA response action, and we cannot say that CERCLA implicitly repealed RCRA's enforcement provision given CERCLA's clear statement to the contrary. See Manor Care, Inc. v. Yaskin, 950 F.2d 122, 127 (3d Cir.1991) ("Congress did not intend for CERCLA remedies to preempt complementary state remedies."). While the decision to use CERCLA or RCRA to cleanup a site is normally a "policy question [ ] appropriate for agency resolution," Apache Powder Co. v. United States, 968 F.2d 66, 69 (D.C.Cir.1992), the plain language of both statutes provides for state enforcement of its RCRA responsibilities despite an ongoing CERCLA response action. Thus, enforcement actions under state hazardous waste laws which have been authorized by the EPA to be enforced by the state in lieu of RCRA do not constitute "challenges" to CERCLA response actions; therefore, § 9613(h) does not jurisdictionally bar Colorado from enforcing the final amended compliance order.
 
 V.
 
 35
 Even if an action by Colorado to enforce the final amended compliance order would be a "challenge" to the Army's CERCLA response action, the plain language of § 9613(h) would only bar a federal court from exercising jurisdiction over Colorado's action. Colorado, however, is not required to invoke federal court jurisdiction to enforce the final amended compliance order. Rather, Colorado can seek enforcement of the final amended compliance order in state court. Therefore, § 9613(h) cannot bar Colorado from taking "any" action to enforce the final compliance order.
 
 
 36
 The final amended compliance order was issued by CDH pursuant to its authority under CHWMA. CHWMA not only authorizes CDH to issue compliance orders, it also authorizes CDH to request the state attorney general to bring suit for injunctive relief or civil or criminal penalties. Colo.Rev.Stat. § 25-15-308(2)(a) (Supp.1992). See also id. § 25-15-309 (administrative and civil penalties); id. § 25-15-310 (criminal offenses-penalties). Compare 42 U.S.C. § 6928(a)(1) (West Supp.1992) (authorizing the EPA to issue RCRA compliance orders, assess civil penalties, and bring civil enforcement action); Id. § 6928(d) (criminal penalties for knowing violations of RCRA). Unlike RCRA-enforcement suits by the EPA which must be brought in federal court, 42 U.S.C. § 6928(a)(1) (West Supp.1992), CHWMA enforcement actions must be brought in the state "district court for the district in which the site or facility is ... located" or in the "district in which the violation occurs." Colo.Rev.Stat. §§ 25-15-305(2)(b), 25-15-309(1) (Supp.1992). As the operator of a federal facility subject to regulation under CHWMA, the Army is subject to "process or sanction" of the Colorado state courts with respect to enforcement of CHWMA. 42 U.S.C. § 6961 (West 1983). Because Colorado may bring an enforcement suit in state court, § 9613(h) does not preclude Colorado from taking "any" action to enforce the final amended compliance order.
 
 VI.
 
 37
 By distinguishing its February 1989 order, which recognized that Colorado could enforce CHWMA with respect to Basin F, from its order in this case, which enjoined Colorado and CDH from taking any action to enforce the final amended compliance, based on the EPA's subsequent placement of Basin F on the national priority list, the district court also appears to have implicitly relied on 42 U.S.C. § 9620(a)(4) (West Supp.1992). Section 9620 sets forth CERCLA's application to federal facilities. Subsection (a)(4) provides, in relevant part, that "[s]tate laws concerning removal and remedial action, including State laws regarding enforcement, shall apply to removal and remedial action at facilities owned or operated by a department, agency, or instrumentality of the United States when such facilities are not included on the National Priority list." Id. Apparently, the district court construed this subsection as precluding the application or enforcement of state laws concerning removal or remedial action at federal facilities which are listed on the national priority list.
 
 
 38
 As the United States candidly concedes, the district court's application of § 9620(a)(4) is incorrect. See Appellee's Br. at 36. At most, § 9620(a)(4) determines the controlling law, not federal court jurisdiction over actions by a state. Moreover, the district court's reasoning regards CHWMA as a state law "concerning removal and remedial action." While we recognize that CERCLA's definition of "removal and remedial action" is conceivably broad enough to encompass certain RCRA corrective actions, see 42 U.S.C. §§ 9601(23), 9601(24) (West Supp.1992), we believe that had Congress intended § 9620(a)(4) to exclude states from enforcing their EPA-delegated RCRA responsibilities, it would have expressly said so. The district court's reasoning is contrary to § 9620(i) which expressly preserves the obligations of federal agencies "to comply with any requirement of [RCRA] (including corrective action requirements)." 42 U.S.C. § 9620(i) (West Supp.1992). This provision indicates that Congress did not intend that RCRA, or state laws authorized by the EPA to be enforced in lieu of RCRA, to be equivalent to laws concerning removal and remedial actions.
 
 
 39
 Despite the United States' concession concerning the incorrect application of § 9620(a)(4), it argues that the listing of Basin F on the national priority list removes any doubt that Colorado's enforcement of CHWMA at the Arsenal is precluded by § 9613(h). However, the national priority list is nothing more than "the list of priority releases for long-term remedial evaluation and response." 40 C.F.R. § 300.425(b) (1992). It "serves primarily informational purposes, identifying for the States and the public those facilities and sites or other releases which appear to warrant remedial action."[19] S.Rep. No. 848, 96th Cong., 2d Sess. 60 (1980). Placement on the national priority list simply has no bearing on a federal facility's obligation to comply with state hazardous waste laws which have been authorized by an EPA delegation of RCRA authority or a state's ability to enforce such laws.
 
 VII.
 
 40
 The United States alternatively contends that CERCLA's provision, which grants the President authority to select the remedy and allow for state input through the ARAR's process, see 42 U.S.C. § 9621 (West Supp.1992), bars Colorado from enforcing state law independent of CERCLA. This is a curious argument in light of §§ 9614(a) and 9652(d) which expressly preserve state RCRA authority, and we find it to be without merit.
 
 A.
 
 41
 While the United States does not dispute that Congress intended states to play a role in hazardous waste cleanup, the United States argues that the states' role when a CERCLA response action is underway is confined to CERCLA's ARAR's process.[20] Undoubtedly, CERCLA's ARAR's provision was intended to provide "a mechanism for state involvement in the selection and adoption of remedial actions which are federal in character." Colorado v. Idarado Mining Co., 916 F.2d 1486, 1495 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1584, 113 L.Ed.2d 648 (1991). See also United States v. Akzo Coatings of Am., Inc., 949 F.2d 1409, 1455 (6th Cir.1991) (ARAR's provisions "reflect Congress' special concern that state interests in the health and welfare of their citizens be preserved, even in the face of a comprehensive federal environmental statute"). Nonetheless, nothing in CERCLA supports the contention that Congress intended the ARAR's provision to be the exclusive means of state involvement in hazardous waste cleanup.
 
 
 42
 Contrary to the United States' claim, Colorado is not invading the President's authority to select a CERCLA remedial action. Rather, Colorado is merely insuring that the Army comply with CHWMA which §§ 9614(a) and 9652(d) of CERCLA expressly recognize is applicable. Sections 9614(a) and 9652(d) were included within CERCLA when it was originally enacted in 1980. See Pub.L. No. 96-510, §§ 114(a), 302(d), 94 Stat. 2795, 2808 (1980). However, the ARAR's provision was not enacted until the 1986 amendments to CERCLA. See Pub.L. No. 99-499, § 121, 100 Stat. 1672 (1986). Certainly, Congress could not have intended the ARAR's provision to be the exclusive means of state involvement in hazardous waste cleanup as provided under §§ 9614(a) and 9652(d) when the ARAR's concept did not even come into being until six years after CERCLA was enacted.
 
 
 43
 Moreover, while the ARAR's provision requires the President to allow a state to participate in remedial planning and to review and comment on remedial plans, 42 U.S.C. § 9621(f)(1) (West Supp.1992), it only allows states to ensure compliance with state law at the completion of the remedial action. See id. §§ 9621(d)(2)(A), 9621(f)(2), 9621(f)(3). However, §§ 9614(a) and 9652(d) expressly contemplate the applicability of other federal and state hazardous waste laws regardless of whether a CERCLA response action is underway. Given that RCRA clearly applies during the closure period of a regulated facility, see 40 C.F.R. § 264.228 (1992); id. § 265.228, the ARAR's provision cannot be the exclusive means of state involvement in the cleanup of a site subject to both RCRA and CERCLA authority.
 
 
 44
 Contrary to the United States' claim, permitting state involvement in hazardous waste cleanup outside of CERCLA's ARAR's process, based on independent state authority, does not render the ARAR's process irrelevant. When a state does not have independent authority over the cleanup of a particular hazardous waste site, the ARAR's provision insures that states have a meaningful voice in cleanup. However, when, as here, a state has RCRA authority over a hazardous waste site, §§ 9614(a) and 9652(d) expressly preserve the state's exercise of such authority regardless of whether a CERCLA response action is underway.[21]B.
 
 
 45
 The United States also argues that to allow Colorado to enforce the final amended compliance order would violate CERCLA's provision that "[n]o Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely onsite, where such remedial action is selected and carried out in compliance with [§ 9621]." 42 U.S.C. § 9621(e)(1) (West Supp.1992). While this provision arguably conflicts with §§ 9652(d) and 9614(a) when a state has been authorized to issue and enforce RCRA permits, the facts of this case do not require us to reconcile the potential conflict. The final amended compliance order does not require the Army to obtain a permit. Rather, it merely requires the Army to update its existing RCRA/CHWMA permit application to include all units currently containing Basin F hazardous waste, see Appellants' App. at 101, as required by both RCRA and CHWMA regulations applicable to interim status facilities.[22] See 40 C.F.R. § 270.72(a)(3); 6 Colo.Code Regs. 1007-3 § 100.11(d)(1) (1993). Thus, enforcement of the final amended compliance order would not violate § 9621(e)(1).
 
 C.
 
 46
 The United States also directs us to CERCLA's section governing "[s]ettlements," 42 U.S.C. § 9622 (West Supp.1992), and specifically its provision, within the "[s]pecial notice procedures" subsection, entitled "[i]nconsistent response action." Id. § 9622(e)(6). This provision states that
 
 
 47
 [w]hen either the President, or a potentially responsible party pursuant to an administrative order or consent decree under [CERCLA], has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.
 
 
 48
 Id. While the relevance of § 9622(e)(6) to the present case is unclear, the United States relies on the EPA's interpretation of this provision in a policy statement concerning the listing of federal facilities on the national priority list. See 54 Fed.Reg. 10,520 (1989). In the course of discussing why it would not apply its policy of deferring placement of RCRA-subjected sites on the national priority list to federal facilities, the EPA recognized that when it undertakes a CERCLA response action at a site subject to state-delegated RCRA authority, a conflict may arise "from the overlap of the corrective action authorities of the two statutes." Id. at 10,522. The EPA takes the position that § 9622(e)(6) gives the EPA final authority over the remedy when the conflicting views of the EPA and a RCRA-authorized state cannot be resolved in regard to a site where a RI/FS has been initiated. Id. at 10,523. In the EPA's view, § 9622(e)(6)'s authorization requirement applies, not only to a potentially responsible party's independent remedial action, but also to any action by a party which has been ordered by the state under its RCRA authority "as both types of action could be said to present a potential conflict with a CERCLA authorized action." Id. Thus, in the case of a conflict between the EPA and the state, § 9622(e)(6) authorizes the EPA to withhold authorization to a potentially responsible party from going forward with a RCRA corrective action ordered by the state. Id. Not surprisingly, the United States argues for deference to the EPA's interpretation of § 9622(e)(6). See Hill v. National Transp. Safety Bd., 886 F.2d 1275, 1278 (10th Cir.1989).
 
 
 49
 The EPA's interpretation of § 9622(e)(6) has several problems, not the least of which is that it permits the EPA to preempt state law contrary to § 9614(a) and to modify a responsible party's obligations and liabilities under state RCRA programs contrary to § 9652(d). Section § 9622(e)(6) makes absolutely no mention of RCRA-authorized state actions, and it seems highly suspect that Congress intended this provision which is buried within a subsection entitled "notice provisions" in a section addressing settlements with private responsible parties to resolve conflicts between state-RCRA laws and CERCLA response actions. See H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 100 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2882 (§ 9622 was "designed to encourage and facilitate negotiated private party cleanup").
 
 
 50
 Moreover, applying the EPA's interpretation of § 9622(e)(6) to federal facilities is contrary to the plain language of CERCLA's section specifically addressing federal facilities. 42 U.S.C. § 9620 (West Supp.1992). Congress expressly provided within the federal facilities section that "[n]othing in this section shall affect or impair the obligation of any department, agency or instrumentality of the United States to comply with any requirement of [RCRA] (including corrective action requirements)." Id. § 9620(i). While the EPA takes the position that its interpretation of § 9622(e)(6) is not inconsistent with § 9620(i) because RCRA requirements can be achieved through the ARAR's process pursuant to § 9621(d)(2), 54 Fed.Reg. at 10,526, the ARAR's process cannot be the exclusive means of a RCRA-authorized state's involvement in the cleanup of a RCRA-regulated site because otherwise a party's obligations under other federal and state hazardous waste laws would be modified during the closure period contrary to § 9652(d), and state law would be preempted contrary to § 9614(a). See supra. By the same reasoning, if the ARAR's process constituted a state's sole means of enforcing its RCRA program at a federal facility, the federal agency's RCRA obligations prior to completion of the CERCLA remedial action would be "affected or impaired" contrary to the plain language of § 9620(i). See H.R.Rep. No. 253(I), at 95, reprinted in 1986 U.S.C.C.A.N. at 2877 (federal facilities section "provides the public, states, and [the EPA] increased authority and a greater role in assuring the problems of hazardous substance releases are dealt with by expeditious and appropriate response actions").
 
 
 51
 Finally, § 9622(e)(6) is triggered by the initiation of a RI/FS. The federal facilities provision requires federal agencies to commence a RI/FS within six months after the facility is included on the national priority list, 42 U.S.C. § 9620(e)(1) (West Supp.1992), and commence a remedial action within fifteen months of the study's completion, id. § 9620(e)(2), while at the same time providing that this section does not affect or impair the agency's RCRA corrective action requirements. Id. § 9620(i). Certainly, Congress could not have intended to require a RI/FS and RCRA compliance in one section while at the same time barring RCRA compliance when a RI/FS is initiated in another section. As summed up by one commentator, "if placement on the [national priority list], completion of a RI/FS, and initiation of remedial action pursuant to [§ 9620] does not impair RCRA obligations, mere initiation of the required investigation cannot have this effect." Joseph M. Willging, Why the EPA's Current Policies on Potential CERCLA-RCRA Authority Conflicts May be Wrong, 1 Fed. Facilities Envtl. J. 69, 82-83 (Spring 1990).
 
 
 52
 Because the EPA's interpretation of § 9622(e)(6) is "contrary to the plain and sensible meaning" of §§ 9622, 9614(a) and 9652(d), and, when applied to federal facilities, § 9620, we do not afford it any deference. Hill, 886 F.2d at 1278 (quotations omitted). In our view, § 9622(e)(6) does not bar a state from exercising its EPA-delegated RCRA authority at a federal facility where a RI/FS has been initiated.
 
 VIII.
 
 53
 We REVERSE the district court's grant of summary judgement for Plaintiff-Appellee, the United States. We REMAND to the district court with instructions to VACATE the order prohibiting Defendants-Appellants, Colorado and CDH, from taking any action to enforce the final amended compliance order and for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Earl E. O'Connor, Senior Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 Among the standards promulgated by the EPA are specific requirements governing the closure of hazardous waste treatment, storage and disposal facilities. See 40 C.F.R. § 264.228 (1992) (closure and post-closure care); id. § 265.228 (closure and post-closure care for interim status facilities). See also 1 Donald W. Stever, Law of Chemical Regulation and Hazardous Wastes, § 5.06[d][iii][A], at 5-65 (1991)
 
 
 [2]
 Pending permit approval, RCRA permitted preexisting hazardous waste treatment, storage and disposal facilities to continue operating during the permit application process under "interim status." 42 U.S.C. § 6925(e)(1) (West Supp.1992)
 
 
 [3]
 Congress encouraged states to develop their own hazardous waste programs by directing the EPA to "promulgate guidelines to assist States in the development of [such] programs." 42 U.S.C. § 6926(a) (West 1983)
 
 
 [4]
 In United States Dep't of Energy v. Ohio, --- U.S. ----, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992), the Supreme Court held that federal agencies retained sovereign immunity from state civil penalties imposed under RCRA. Id. at ---- - ----, 112 S.Ct. at 1639-40. See also Mitzelfelt v. Department of Air Force, 903 F.2d 1293, 1296 (10th Cir.1990). However, Congress recently amended § 6961 to clearly provide that federal agencies are not immune from such penalties. See Federal Facility Compliance Act of 1992, Pub.L. No. 102-386, § 102, 106 Stat. 1505
 
 
 [5]
 In 1984, Congress amended RCRA with the enactment of HSWA which sought to close "various loopholes" that were allowing millions of tons of hazardous waste to escape RCRA's control. See H.R.Rep. No. 198(I), 98th Cong., 2d Sess. 19, reprinted in 1984 U.S.C.C.A.N. 5576, 5578. Congress was concerned that RCRA was not being "conducted in a manner that controls and prevents present and potential endangerment to public health and the environment" and enacted HSWA to prevent "future burdens on the 'Superfund' program...." Id. at 20, reprinted in 1984 U.S.C.C.A.N. at 5579
 
 
 [6]
 Congress amended CERCLA in 1986 by enacting SARA after realizing that CERCLA was "inadequate" to address the environmental threat presented by abandoned hazardous waste sites. See H.R.Rep. No. 253, 99th Cong., 2d Sess. 54-55 (1985), reprinted in 1986 U.S.C.C.A.N. 2835, 2836-37. SARA "buil[t] on existing law and significantly strengthen[ed] [CERCLA] in all respects ... [as well as] provid[ing] the EPA with appropriate flexibility and discretion in order to respond appropriately to each site...." Id. at 56, reprinted in 1986 U.S.C.C.A.N. at 2838
 
 
 [7]
 Obtaining a RCRA permit is a two-step process. Part A of the permit application requires general information concerning the facility, the operator, the hazardous wastes and the processes for treatment, storage and disposal. See 40 C.F.R. § 270.13 (1992). Part B of the permit application requires more detailed information including a specific closure plan. See id. § 270.14
 
 
 [8]
 As a hazardous waste surface impoundment, Basin F is subject to specific RCRA regulations. See 40 C.F.R. §§ 265.220-265.230 (1992) (interim status standards for surface impoundments). Further, under HSWA, an interim status surface impoundment cannot receive, store, or treat hazardous waste after November 8, 1988, unless (1) it is in compliance with § 6924(o)(1)(A) which requires the "installation of two or more liners," a "leachate collection system," and "groundwater monitoring," or (2) it has at least one liner and there is no evidence that it is leaking, is located more that a quarter mile from an underground source of drinking water, and is in compliance with the groundwater requirements applicable to RCRA permitted facilities. See 42 U.S.C. § 6925(j) (West Supp.1992). See also id. § 6924(o)(1)
 
 
 [9]
 While most of the President's CERCLA authority has been delegated to the EPA pursuant to 42 U.S.C. § 9615 (West 1983), the President delegated his CERCLA response action authority under § 9604(a-b) with respect to Department of Defense facilities to the Secretary of Defense. See Exec. Order No. 12,316, 46 Fed.Reg. 42,237 (1981), as amended by Exec. Order No. 12,418, 48 Fed.Reg. 20,891 (1983), revoked by and current delegation of authority at Exec. Order No. 12,580, 52 Fed.Reg. 2,923 (1987). A RI/FS is the first step in a CERCLA remedial action in order "to assess site conditions and evaluate alternatives to the extent necessary to select a remedy." 40 C.F.R. § 300.430(a)(2) (1992). Interestingly, the Army initiated the RI/FS during the month preceding HSWA's effective date, which provided that RCRA interim status surface impoundments undertake corrective action in order to continue treating, storing and disposing of hazardous waste after November 1988. See supra note 8. The Army has since maintained that its CERCLA response action precludes Colorado from enforcing its EPA-delegated RCRA authority at the Arsenal
 
 
 [10]
 From 1946 to 1982, Shell leased a portion of the Arsenal from the Army and disposed of hazardous wastes in Basin F
 
 
 [11]
 The Basin F interim response action led several nearby residents to sue for damages allegedly caused by the release of airborne pollutants. See Daigle v. Shell Oil Co., 972 F.2d 1527, 1532 (10th Cir.1992). The Basin F interim response action also calls for the Army to incinerate the removed liquids. This has yet to be done. Final disposition of the solids remaining under the Basin F cap and in the wastepile will be determined as part of the remedial action for which a final record of decision will be issued in 1994
 
 
 [12]
 Additionally, the district court relied on RCRA's provision regarding its application to federal facilities, 707 F.Supp. at 1565 (citing 42 U.S.C. § 6961), and its citizen suit provision. Id. at 1565-66 (citing 42 U.S.C. § 6972). The district court also relied on CERCLA's provisions permitting a state to impose additional requirements on the release of hazardous waste and preserving all other obligations or liabilities of persons under other federal or state law, id. at 1569 (citing 42 U.S.C. §§ 9614(a), 9652(d)), and CERCLA's provisions concerning federal facilities which indicated to the district court that CERCLA did not affect or impair the obligation of a federal facility to comply with RCRA. Id. (citing 42 U.S.C. §§ 9620(a)(1), 9620(a)(4), 9620(i))
 
 
 [13]
 The district court noted that the Army, as a responsible party, has an "obvious financial interest to spend as little money and effort as possible on the cleanup," whereas the EPA has the responsibility "to achieve a clean up as quickly and thoroughly as possible...." 707 F.Supp. at 1570. The district court also noted that the same Justice Department attorneys were representing both the Army and the EPA despite the court's expressed concern over a conflict. Id
 
 
 [14]
 Although the EPA had listed the Arsenal on the national priority list in July 1987, 52 Fed.Reg. 27,620, 27,641 (1987), Basin F was expressly excluded from the national priority list "because the EPA believed that Basin F might be subject to RCRA Subtitle C corrective action authorities and thus might be appropriate for deferral...." 54 Fed.Reg. 10,512, 10,515 (1989). See also 48 Fed.Reg. 40,682 (1983) (describing EPA policy of deferring national priority listing of sites undergoing RCRA cleanup); 49 Fed.Reg. 40,323-40,324, 40,336 (1984). See generally Apache Powder Co. v. United States, 968 F.2d 66, 68 (D.C.Cir.1992). When the EPA added Basin F to the national priority list in 1989, it indicated that Basin F should not have been deferred from listing under the policy in effect in 1987 because it had stopped receiving RCRA hazardous wastes prior to July 26, 1982 and did not certify closure prior to January 26, 1983. 54 Fed.Reg. at 10,515-10,516 & n. 2
 
 
 [15]
 The United States filed the present action while the Army's motion for reconsideration of the district court's February 1989 order in Colorado's enforcement action was still pending. Following the district court's ruling in the present case, the district court dismissed Colorado's earlier enforcement action which was the subject of the district court's February 1989 order
 
 
 [16]
 Colorado also counterclaimed for civil penalties. The district court dismissed this counterclaim on sovereign immunity grounds, relying on this court's opinion in Mitzelfelt v. Department of Air Force, 903 F.2d 1293 (10th Cir.1990). See United States v. Colorado, No. 89-C-1646 (D.Colo. June 19, 1990) (order). Although Congress has subsequently amended RCRA to expressly allow for civil penalties to be enforced against federal facilities, see supra note 4, Colorado has not appealed the dismissal of its counterclaim for civil penalties
 
 
 [17]
 Colorado also argues that the district court's order violates the separation of powers doctrine by allowing an executive branch agency to dictate the outcome of pending litigation. In light of our holding, we need not address this argument
 
 
 [18]
 "Person" under CERCLA is defined to include the United States government. 42 U.S.C. § 9601(21) (West Supp.1992)
 
 
 [19]
 The legal significance of a particular site being placed on the national priority list is that "[o]nly those releases included on the [national priority list] shall be considered eligible for Fund-financed remedial action." 40 C.F.R. § 300.425(b)(1) (1992). Given that federal facilities, like the Arsenal, are not eligible for Superfund-financed remedial action, 42 U.S.C. § 9611(e)(3) (West Supp.1992); 40 C.F.R. § 300.425(b)(3) (1992), placement of a federal facility on the national priority list serves only informational purposes. See 54 Fed.Reg. 10,520, 10,521 (1989) (EPA Listing Policy for Federal Facilities) ("placing Federal facility sites on the [national priority list] serves an important informational function and helps to set priorities and focus cleanup efforts on those Federal sites that present the most serious problems")
 
 
 [20]
 CERCLA provides that "[t]he President shall select appropriate remedial actions determined to be necessary to be carried out under section 9604 ... which are in accordance with this section, and to the extent practicable, the national contingency plan, and which provide for cost effective response." 42 U.S.C. § 9621(a) (West Supp.1992). Any hazardous substance remaining on site at the completion of the remedial action may be subject to a level or standard of control equivalent to any federal or state ARAR, including RCRA or state hazardous waste laws. Id. § 9621(d)(2)(A). The President has the authority to waive federal or state ARAR's in selecting a remedial action under certain circumstances. See id. § 9621(d)(4). When the President waives ARAR's with respect to federal facilities, the state may seek judicial review in federal court, limited to the administrative record, to determine whether the President's finding supporting the waiver is supported by substantial evidence. Id. § 9621(f)(3)(B)(i). If substantial evidence does not support the President's finding, a court may modify the remedial action to conform to the ARAR, id. § 9621(f)(3)(B)(ii); however, if the state fails to establish that the President's finding is not supported by substantial evidence, the state may pay the additional cost attributable to meeting the ARAR. Id. § 9621(f)(3)(B)(iii)
 
 
 [21]
 The United States relies on Idarado Mining and Akzo Coatings to support its claim that the ARAR's provision provides the exclusive means for state involvement in the cleanup of a hazardous waste site where a CERCLA response action is underway. In Idarado Mining, we held that § 9621(e)(2) which authorizes a state to "enforce any Federal or State standard, requirement, criteria, or limitation to which the remedial action is required to conform under" CERCLA in federal district court, did not authorize the district court to grant a state injunctive relief in the state's CERCLA response cost action. 916 F.2d at 1494. Unlike Idarado Mining, Colorado here is not seeking to broaden its § 9607 response action authority or § 9621(e)(2) ARAR enforcement authority under CERCLA
 In Akzo Coatings, the Sixth Circuit held that the terms of a consent decree between the EPA and a responsible party "set the parameters of relief available to the state" against the responsible party, and § 9621(f) precluded the state from pursuing alternative state remedies against the responsible party. 949 F.2d at 1454-55. Unlike the state in Akzo Coatings, Colorado is asserting its independent EPA-delegated RCRA authority rather than challenging the selection of a CERCLA remedy.
 
 
 [22]
 While Basin F lost its interim status on November 8, 1985, because the Army never requested a final Part B permit determination and never certified compliance with applicable groundwater monitoring requirements, see 42 U.S.C. § 6925(e)(2) (West Supp.1993), the Army is obligated to comply with RCRA and/or CHWMA regulations applicable to interim status facilities pending closure of Basin F pursuant to an approved closure plan. See 40 C.F.R. § 265.1(a) (1992) (standards for interim status facilities "define the acceptable management of hazardous waste during the period of interim status and until certification of final closure"); id. § 265.1(b) (interim status standards "apply ... until either a permit is issued ... or until applicable ... closure and post-closure responsibilities are fulfilled ). See also 6 Colo.Code Regs. 1007-3 § 265.1(a-b) (1993)